**Ex parte José Ernesto MEDELLÍN, Applicant.**

**No. AP–75207.**

Court of Criminal Appeals of Texas.

Nov. 15, 2006.

Gary A. Taylor, Austin, and Michael B. Charlton, Alvin, for appellant.

Charles A. Rosenthal, Jr., Houston, Matthew Paul, State's Attorney, Austin, for State.

### *OPINION*

KEASLER, J., delivered the opinion of the Court with respect to Parts I, II, III.A., III.C., and IV, in which KELLER, P.J., MEYERS, PRICE, JOHNSON, HERVEY, HOLCOMB, and COCHRAN, JJ., joined, and an opinion with respect to Part III.B., in which MEYERS, PRICE, and HERVEY, JJ., joined.

José Ernesto Medellín filed this subsequent application, alleging that the International Court of Justice *Avena* decision and the President's memorandum directing state courts to give effect to *Avena*, require this Court to reconsider his Article 36 Vienna Convention claim because they (1) constitute binding federal law that preempt Section 5, Article 11.071 and (2) were previously unavailable factual and legal bases under Section 5(a)(1). We hold that *Avena* and the President's memorandum do not preempt Section 5 and do not qualify as previously unavailable factual or legal bases.

## I. PROCEDURAL HISTORY OF MEDELLÍN'S CASE

Medellín, a Mexican national, was convicted of capital murder and sentenced to death for his participation in the gang rape and murder of two teenage girls in Houston. We affirmed his conviction and sentence on direct appeal.[1]

Medellín filed an initial application for a writ of habeas corpus, claiming for the first time, among other things, that his rights under Article 36 of the Vienna Convention had been violated because he had not been advised of his right to contact the Mexican consular official after he was arrested.[2] The district court found that Medellín failed to object to the violation of his Vienna Convention rights at trial and, as a result, concluded that his claim was procedurally barred from review. The court also found, in the alternative, that Medellín, as a private individual, did not have standing to bring a claim under the Vienna Convention because it is a treaty among nations and therefore does not confer enforceable rights on individuals; only signa-

---

1. *Medellín v. State*, No. AP–71,997, slip op. (Tex.Crim.App. Mar. 19, 1997) (not designated for publication).

2. *Ex parte Medellín*, No. 675430–A (339th Dist.Ct. Jan. 22, 2001).

tory nations have standing to raise a claim under the treaty. Offering an additional alternative, the court determined that Medellín failed to show harm because he received effective legal representation and his constitutional rights had been safeguarded. Finally, the court concluded that Medellín did not prove that his rights under the Fifth, Sixth, and Fourteenth Amendments had been violated and that he failed to show that any non-notification affected the validity of his conviction and sentence. We adopted the trial court's findings of fact and conclusions of law with written order and denied relief.[3]

Medellín then presented his Vienna Convention claim in a federal petition for a writ of habeas corpus. The district court denied relief,[4] and Medellín filed for a certificate of appealability. While his application was pending, the International Court of Justice (ICJ) issued its decision in *Avena.*[5] In that case, Mexico claimed that the United States had violated the Vienna Convention by failing to timely advise more than fifty Mexican nationals awaiting execution in United States prisons, including Medellín, of their right to talk to a consular official after they had been detained.[6] The ICJ ruled in favor of Mexico, holding that the Vienna Convention does confer individual rights and that the United States violated the Convention.[7] To

remedy the violation, the ICJ ordered the United States to provide review and reconsideration of the convictions and sentences [8] at issue to determine whether the violation "caused actual prejudice to the defendant in the process of administration of criminal justice." [9] The ICJ specifically stated that review is required regardless of procedural default rules that would otherwise bar review.[10]

The federal district court denied Medellín's application for a certificate of appealability, and Medellín appealed to the United States Court of Appeals for the Fifth Circuit, which also denied his application.[11] The Fifth Circuit noted the ICJ decision in *Avena,* but determined that it was bound by the Supreme Court's decision in *Breard v. Greene,* which held that claims based on a violation of the Vienna Convention are subject to procedural default rules.[12] Continuing, the court found that even if Medellín's Vienna Convention claim was not procedurally defaulted, its previous holding in *United States v. Jimenez–Nava*—that the Vienna Convention does not create individually enforceable rights—would require it to deny Medellín's application for a certificate of appealability.[13]

Medellín petitioned for certiorari to the Supreme Court of the United States, which granted review.[14] Before oral argu-

---

3. *Ex parte Medellín,* No. WR–50,191–01 (Tex. Crim.App. Oct. 3, 2001) (not designated for publication).

4. *Medellín v. Cockrell,* Civ. No. H–01–4078, 2003 WL 25321243 (S.D.Tex. Apr. 17, 2003).

5. *Case Concerning Avena and other Mexican Nationals (Mex. v. U.S.),* 2004 I.C.J. No. 128 (Judgment of Mar. 31).

6. *Id.* ¶¶ 13–16, 49.

7. *Id.* ¶¶ 90, 106, 140.

8. *Id.* ¶¶ 138–40.

9. *Id.* ¶ 121.

10. *Id.* ¶¶ 112–13, 153(9), (11).

11. *Medellín v. Dretke,* 371 F.3d 270, 273, 281 (5th Cir.2004).

12. *Id.* at 280 (citing *Breard v. Greene,* 523 U.S. 371, 118 S.Ct. 1352, 140 L.Ed.2d 529 (1998)).

13. *Id.* (citing *United States v. Jimenez–Nava,* 243 F.3d 192, 198 (5th Cir.2001)).

14. *Medellín v. Dretke,* 543 U.S. 1032, 125 S.Ct. 686, 160 L.Ed.2d 518 (2004).

ment, the President issued a memorandum directing state courts to give effect to the *Avena* decision under the principles of comity.[15] Then, while his case was pending before the Supreme Court, Medellín filed an application for a writ of habeas corpus in this Court, requesting that we give full effect to the *Avena* decision and to the President's memorandum.[16] The Supreme Court subsequently dismissed Medellín's case as improvidently granted, stating that there is a possibility that "Texas courts will provide Medellín with the review he seeks pursuant to the *Avena* judgment and the President's memorandum...."[17]

Based on the Supreme Court's dismissal, we determined that Medellín's subsequent application is ripe for consideration.[18] We therefore filed and set this case for submission.

Under Article 11.071, Section 5(a) of the Code of Criminal Procedure, we may not consider the merits of any claims raised on a subsequent application for a writ of habeas corpus or grant relief unless the applicant provides sufficient specific facts demonstrating that:

- "the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application ... because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application";[19]

- "by a preponderance of the evidence, but for a violation of the United States Constitution no rational juror could have found the applicant guilty beyond a reasonable doubt";[20] or

- "by clear and convincing evidence, but for a violation of the United States Constitution no rational juror would have answered in the State's favor one or more of the special issues...."[21]

We ordered Medellín and the State to brief the following issue: whether Medellín "meets the requirements for consideration of a subsequent application for writ of habeas corpus under the provisions of Article 11.071, section 5, of the Texas Code of Criminal Procedure."[22] We also invited the Attorney General of the United States to "present the views of the United States."[23] On September 14, 2005, we heard oral argument from the parties and the Solicitor General, who argued on behalf of the Attorney General of the United States. Medellín's claims raise many remarkable issues of first impression for this Court to resolve. Before we provide some necessary background information, we begin with a brief overview of the arguments advanced by the parties and the United States as *amicus curiae*.

**15.** President's Memorandum for the Attorney General, Subject: Compliance with the Decision of the International Court of Justice in *Avena* (Feb. 28, 2005), *available at* http://www.white house.gov/news/releases/2005/02/20050228– 18.html [hereinafter PRESIDENTIAL MEMORANDUM].

**16.** *Ex parte Medellín*, 206 S.W.3d 584 (Tex. Crim.App.2005), Application No. AP–75,207.

**17.** *Medellín v. Dretke*, 544 U.S. 660, 125 S.Ct. 2088, 2092, 161 L.Ed.2d 982 (2005) (per curiam).

**18.** *Ex parte Medellín*, No. AP–75,207 (per curiam order) (designated for publication).

**19.** TEX.CODE CRIM. PROC. art. 11.071 § 5(a)(1) (Vernon 2003).

**20.** *Id.* § 5(a)(2).

**21.** *Id.* § 5(a)(3).

**22.** *Ex parte Medellín*, No. AP–75,207 (per curiam order) (designated for publication).

**23.** *Id.; see* 28 C.F.R. § 0.5 (2005).

Medellín argues that the *Avena* decision and the President's memorandum are binding federal law that preempt Section 5 under the Supremacy Clause of the United States Constitution.[24] Alternatively, contending that he meets the requirements of Section 5(a)(1), Medellín claims that the *Avena* decision and the President's memorandum are previously unavailable factual and legal bases because neither was available when he filed his first application.[25] Countering Medellín's arguments, the State contends that the *Avena* decision and the President's memorandum do not meet the requirements of Section 5 and do not override it.[26] Finally, the United States as *amicus curiae* asserts that, although *Avena* is not enforceable in United States courts, Medellín is entitled to review and reconsideration of the merits of his Vienna Convention claim "to the extent that his claim relies on the President's determination that 'review and reconsideration' ... by Texas courts is necessary for compliance with the United States' international obligations."[27] The United States also avers that "Section 5 would contravene the President's implementation of treaty obligations, and federal law would preempt its operation in the circumstances of this case."[28]

## II. CONTEXTUAL BACKGROUND

### A. Treaties

Treaties are compacts between sovereign nations.[29] In the international arena, compliance with a treaty depends upon "the interest and the honor" of the treaty's member nations.[30] When a member nation violates a treaty, another member nation cannot obtain redress from the judicial body of the violating nation but may seek enforcement through "international negotiations and reclamations."[31]

24. Br. of Applicant at 26–27.

25. *Id.* at 52–53.

26. Br. of Respondent at 20–21.

27. Br. of United States as *Amicus Curiae* at 12.

28. *Id.* at 15.

29. *United States v. Curtiss–Wright Export Corp.*, 299 U.S. 304, 318, 57 S.Ct. 216, 81 L.Ed. 255 (1936) ("operations of the nation in such [foreign] territory must be governed by treaties, international understandings and compacts, and the principles of international law."); *Santovincenzo v. Egan*, 284 U.S. 30, 40, 52 S.Ct. 81, 76 L.Ed. 151 (1931); *B. Altman & Co. v. United States*, 224 U.S. 583, 600, 32 S.Ct. 593, 56 L.Ed. 894 (1912); *Head Money Cases (Edye v. Robertson)*, 112 U.S. 580, 598, 5 S.Ct. 247, 28 L.Ed. 798 (1884); *Rocha v. State*, 16 S.W.3d 1, 15–16 (Tex.Crim. App.2000).

30. *Head Money Cases*, 112 U.S. at 598, 5 S.Ct. 247.

31. *Id.; see also Whitney v. Robertson*, 124 U.S. 190, 194, 8 S.Ct. 456, 31 L.Ed. 386 (1888) ("If the country with which the treaty is made is dissatisfied with the action of the legislative department, it may present its complaint to the executive head of the government, and take such other measures as it may deem essential for the protection of its interests. The courts can afford no redress."); *Baldwin v. Franks*, 120 U.S. 678, 702–03, 7 S.Ct. 656, 32 L.Ed. 766 (1887) (Field, J., dissenting) (when a treaty between the United States and another county is considered as a compact between nations, as opposed to the law of the land, a violation of the treaty is a matter "to be settled by negotiation between the executive departments of the two governments, each government being at liberty to take such measures for redress as it may deem advisable."); *Foster v. Neilson*, 27 U.S. (2 Pet.) 253, 307, 7 L.Ed. 415 (1829) ("The judiciary is not that department of the government, to which the assertion of its interests against foreign powers is confided; and its duty commonly is to decide upon individual rights, according to those principles which the political departments of the nation have established.").

▉ Treaties, entered into by the President of the United States with the consent of a super-majority of the United States Senate,[32] are incorporated into the domestic law of our country pursuant to the Supremacy Clause of the United States Constitution, which commands: "all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."[33] Treaties are "placed on the same footing" as legislation enacted by the United States Congress, and while neither is superior to the other,[34] both are subject to the United States Constitution.[35] In describing the relationship between treaties and acts of Congress, the Supreme Court explained the difference between treaties that do not contain self-executing provisions and those that do:

> When the stipulations are not self-executing they can only be enforced pursuant to legislation to carry them into effect, and such legislation is as much subject to modification and repeal by Congress as legislation upon any other subject. If the treaty contains stipulations which are self-executing, that is,

require no legislation to make them operative, to that extent they have the force and effect of a legislative enactment. Congress may modify such provisions, so far as they bind the United States, or supersede them altogether.[36] When a self-executing treaty and an act of Congress concern the same subject matter, courts should give effect to both unless the language of one would be violated.[37] But when "the two are inconsistent, the one last in date will control the other."[38]

▉ Addressing the relationship between state law and treaties, the Supreme Court has stated: "[T]reaties with foreign nations will be carefully construed so as not to derogate from the authority and jurisdiction of the States of this nation unless clearly necessary to effectuate the national policy."[39] Accordingly, "state law must yield when it is inconsistent with, or impairs the policy or provisions of, a treaty or of an international compact or agreement."[40]

▉ The Supreme Court has recognized that a treaty may contain certain provisions that grant judicially enforceable rights to a foreign national residing in another country.[41] In such cases, under the Supremacy Clause, the provisions of

---

**32.** U.S. Const. art. II, § 2, cl. 2; *see also B. Altman & Co.*, 224 U.S. at 600, 32 S.Ct. 593; *De Lima v. Bidwell*, 182 U.S. 1, 194, 21 S.Ct. 743, 45 L.Ed. 1041 (1901).

**33.** U.S. Const. art. VI, cl. 2; *see also Head Money Cases*, 112 U.S. at 598, 5 S.Ct. 247.

**34.** *Whitney*, 124 U.S. at 194, 8 S.Ct. 456.

**35.** *Reid v. Covert*, 354 U.S. 1, 17, 77 S.Ct. 1222, 1 L.Ed.2d 1148 (1957) (plurality opinion); *De Geofroy v. Riggs*, 133 U.S. 258, 267, 10 S.Ct. 295, 33 L.Ed. 642 (1890); *Cherokee Tobacco*, 78 U.S. (11 Wall.) 616, 620, 20 L.Ed. 227 (1871) ("a treaty cannot change the Constitution or be held valid if it be in violation of that instrument."); *Rocha*, 16 S.W.3d at 15 n. 12.

**36.** *Whitney*, 124 U.S. at 194, 8 S.Ct. 456; *see also Sanchez–Llamas v. Oregon*, 126 S.Ct. at 2680 (2006); *Head Money Cases*, 112 U.S. at 599, 5 S.Ct. 247.

**37.** *Whitney*, 124 U.S. at 194, 8 S.Ct. 456.

**38.** *Id.*

**39.** *United States v. Pink*, 315 U.S. 203, 230, 62 S.Ct. 552, 86 L.Ed. 796 (1942).

**40.** *Id.* at 230–31, 62 S.Ct. 552.

**41.** *Head Money Cases*, 112 U.S. at 598, 5 S.Ct. 247.

the treaty are placed in the "same category as other laws of Congress" and therefore, are "subject to such acts as Congress may pass for its enforcement, modification, or repeal."[42] When a treaty confers rights that are judicially enforceable, a court will look "to the treaty for a rule of decision for the case before it as it would to a statute."[43] However, as we recently noted, there is a presumption that " 'international agreements, even those directly benefitting private persons, generally do not create private rights or provide for a private cause of action in domestic courts.' "[44] Numerous federal circuit courts of appeals have also acknowledged this presumption, finding that treaty rights belong to the member nations only,[45] and therefore, may be enforced only through international political and diplomatic channels.

## B. The United Nations Charter and the Statute of the International Court of Justice

The United Nations was formed when its Charter, drafted in San Francisco at the United Nations Conference on International Organization, was ratified by the United States, the Republic of China, France, the Union of Soviet Socialist Republics, Great Britain, Northern Ireland, and a majority of other signatory nations.[46] With respect to the United States, the Charter entered into force on October 24, 1945. Article 92 establishes the ICJ as "the principal judicial organ of the United Nations."[47] The ICJ operates "in accordance with the annexed Statute [of the ICJ]...."[48] Under Article 93, "All Members of the United Nations are *ipso facto* parties to the Statute of the International

**42.** *Id.* at 599, 5 S.Ct. 247.

**43.** *Id.*

**44.** *Sorto v. State,* 173 S.W.3d 469, 478 (Tex. Crim.App.2005) (quoting RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW OF THE UNITED STATES § 907 *cmt. a,* at 395 (1987) and citing *Hamdan v. Rumsfeld,* 415 F.3d 33, 38–40 (D.C.Cir. 2005), *overruled on other grounds by* ―― U.S. ――, 126 S.Ct. 2749, 165 L.Ed.2d 723 (2006)); *see also Hinojosa v. State,* 4 S.W.3d 240, 252 (Tex.Crim.App.1999) ("Generally, individuals do not have standing to bring suit based on an international treaty when sovereign nations are not involved in the dispute.").

**45.** *Sorto,* 173 S.W.3d at 478 n. 31 (citing *United States v. Jimenez–Nava,* 243 F.3d 192, 195 (5th Cir.2001); *United States v. Li,* 206 F.3d 56, 67 (1st Cir.2000) (Selya & Boudin, JJ., concurring); *United States ex. rel. Lujan v. Gengler,* 510 F.2d 62, 67 (2d Cir.1975); *United States v. Rosenthal,* 793 F.2d 1214, 1232 (11th Cir.1986)); *see also United States v. Emuegbunam,* 268 F.3d 377, 389 (6th Cir. 2001) ("courts presume that the rights created by an international treaty belong to a state and that a private individual cannot enforce them."); *United States ex rel. Saroop*

*v. Garcia,* 109 F.3d 165, 167 (3d Cir.1997) ("Because treaties are agreements between nations, individuals ordinarily may not challenge treaty interpretations in the absence of an express provision within the treaty or an action brought by a signatory nation."); *Goldstar (Panama) S.A. v. United States,* 967 F.2d 965, 968 (4th Cir.1992) ("International treaties are not presumed to create rights that are privately enforceable."); *Matta–Ballesteros v. Henman,* 896 F.2d 255, 259 (7th Cir.1990) ("It is well established that individuals have no standing to challenge violations of international treaties in the absence of a protest by the sovereigns involved."). *But see Sanchez–Llamas,* 126 S.Ct. at 2697 (Breyer, J., dissenting) (stating "no such presumption exists.").

**46.** U.N. Charter introductory note, art. 110, para. 3, 59 Stat. 1031; *see also* Basic Facts about the United Nations, The United Nations: Organization, *available at* http://www. un.org/aboutun/basi cfacts/unorg.htm; Charles Patterson, The Oxford 50th Anniversary Book of the United Nations 7–21 (Oxford University Press) (1995).

**47.** U.N. Charter art. 92.

**48.** *Id.*

Court of Justice."[49] The Statute of the ICJ establishes, among other things, the court's organization, competence (which includes its jurisdiction), and procedures.[50] Article 34 of the Statute provides that "[o]nly states may be parties in cases before the [ICJ]" and, under Article 36(1), the court has jurisdiction over "cases which the parties refer to it and all matters specifically provided for ... in treaties and conventions in force."[51] Under Article 59, an ICJ decision binds only the parties to that particular case.[52] Article 94 of the United Nations Charter states that each member "undertakes to comply with the decision of the International Court of Justice in any case to which it is a party."[53] If a party fails to comply with the ICJ's decision, "the other party may have recourse to the Security Council, which may, if it deems necessary, make recommendations or decide upon measures to be taken to give effect to the judgment."[54]

## C. The Vienna Convention on Consular Relations and the Optional Protocol Concerning the Compulsory Settlement of Disputes

The Vienna Convention on Consular Relations was adopted by the United Nations Conference on Diplomatic Intercourse and Immunities on April 24, 1963.[55] The Vienna Convention is a seventy-nine article multilateral treaty that "promotes the effective delivery of consular services in foreign countries, including access to consular assistance when a citizen of one country is arrested, committed to prison or custody pending trial, or detained in any other manner in another country."[56] Mexico, one of the first countries to deposit its ratification with the United Nations Secretary–General after the Convention opened for signatures on April 18, 1961, became bound by Convention on March 19, 1967.[57] With the advice and consent of the Senate, the President ratified the Convention, which became binding on the United States on December 24, 1969.[58]

Article 36 "ensure[s] that no signatory nation denies consular access and assistance to another country's citizens traveling or residing in a foreign country...."[59] Article 36 reads as follows:

1. With a view to facilitating the exercise of consular functions relating to nationals of the sending State:

 (a) consular officers shall be free to communicate with nationals of the sending State and to have access to them. Nationals of the sending State shall have the same freedom with respect to communication with

---

49. *Id.* art. 93, para. 1.

50. Statute of the International Court of Justice arts. 2–64, June 26, 1945, 59 Stat. 1031 [hereinafter Statute of the ICJ].

51. *Id.* art. 36(1).

52. *Id.* art. 59.

53. U.N. Charter art. 94, para. 1.

54. *Id.* art. 94, para. 2.

55. Vienna Convention on Consular Relations, Apr. 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261 (ratified by the United States on Nov. 24, 1969) [hereinafter Vienna Convention].

56. *Sorto,* 173 S.W.3d at 477; *see also Sanchez–Llamas,* 126 S.Ct. at 2674 ("The Convention consists of 79 articles regulating various aspects of consular activities.").

57. Vienna Convention.

58. *Id.; United States v. Lombera–Camorlinga,* 206 F.3d 882, 884 (9th Cir.2000); *see also* Tenagne Tadesse, *The Breard Aftermath: Is the U.S. Listening?,* 8 Sw. J.L. & Trade Am. 423, 429–30 (2002) (discussing the history of the Vienna Convention).

59. *Sorto,* 173 S.W.3d at 477.

and access to consular officers of the sending State;

(b) if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this subparagraph;

(c) consular officers shall have the right to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation. They shall also have the right to visit any national of the sending State who is in prison, custody or detention in their district in pursuance of a judgment. Nevertheless, consular officers shall refrain from taking action on behalf of a national who is in prison, custody or detention if he expressly opposes such action.

2. The rights referred to in paragraph 1 of this Article shall be exercised in conformity with the laws and regulations of the receiving State, subject to the proviso, however, that the said laws and regulations must enable full effect to be given to the purposes for which the rights accorded under this Article are intended.[60]

In addition to becoming signatories to the Vienna Convention, Mexico and the United States became parties to the Optional Protocol Concerning the Compulsory Settlement of Disputes. Article I of the Optional Protocol states: "Disputes arising out of the interpretation or application of the Convention shall lie within the compulsory jurisdiction of the International Court of Justice and may accordingly be brought before the Court by an application made by any party to the dispute being a Party to the present Protocol." [61] Although the United States recently withdrew from the Optional Protocol, the United States has agreed to "discharge its inter-national obligations under the decision ... by having State courts give effect to the [*Avena*] decision...." [62]

## D. International Court of Justice Rulings on Article 36 of the Vienna Convention Involving the United States

The ICJ has encountered a series of cases filed against the United States by other nations alleging violations of Article 36 of the Vienna Convention. Paraguay filed the first case on behalf of its citizen,

**60.** Vienna Convention, art. 36.

**61.** Optional Protocol Concerning the Compulsory Settlement of Disputes, Apr. 18, 1961, Art. I, 21 U.S.T. 326, T.I.A.S. No. 6820 [hereinafter Optional Protocol].

**62.** PRESIDENTIAL MEMORANDUM; *Medellín*, 125 S.Ct. at 2101 (O'Connor J., dissenting); Letter from Alberto Gonzales, U.S. Attorney General, to Greg Abbott, Texas Attorney General (Apr. 5, 2005); United States Department of State, Daily Press Briefing, Mar. 10, 2005, Adam Ereli, Deputy Spokesman, *available at* http://www.state.gov/r/pa/prs/dpb/2005/43225.htm (stating "in recognition of the optional protocol and our international commitments, the President has determined that the United States will comply with the judgment of the International Court of Justice and that we will review—our state courts will review—the cases that ICJ responded to.").

Angel Francisco Breard.[63] The ICJ issued an order, at Paraguay's request, requesting the United States to stay Breard's execution until it could render a decision.[64] Based on that order, Breard filed an original petition for a writ of habeas corpus and an application to stay his execution in the Supreme Court of the United States.[65] The Supreme Court found that Breard's claim was procedurally defaulted and denied his petition and application; Breard was later executed.[66] Paraguay then requested that the ICJ discontinue the proceedings with prejudice; thus, the ICJ did not issue a decision regarding Breard.[67]

Subsequently, two more suits were filed, *Federal Republic of Germany v. United States of America (LaGrand)*[68] and *Mexico v. United States of America (Avena)*.[69] In *LaGrand*, Germany initiated proceedings in the ICJ on behalf of two of its citizens, brothers Karl and Walter LaGrand, who had been convicted of murder and sentenced to death in Arizona.[70] Germany alleged that the United States violated Article 36 of the Vienna Convention by failing to inform the LaGrands of their right to contact a German consular official.[71] Although both the LaGrands were executed before the ICJ issued its judgment, the ICJ still found, among other things, that: (1) Article 36 of the Vienna Convention confers individual rights on de-

tained foreign nationals; (2) the United States failed to comply with Article 36; and (3) as applied to the LaGrands, the procedural default rules of the United States prevented the rights intended under Article 36 from being given full effect.[72] The court further stated that the United States, "by means of its own choosing, shall allow the review and reconsideration of the conviction and sentence by taking account of the violation of the rights set forth in that Convention."[73]

Almost three years after *LaGrand*, the ICJ handed down its decision in *Avena*. With regard to Medellín and fifty other Mexican nationals, the ICJ concluded that the United States breached its obligations under Article 36, paragraph 1(b) by failing to inform them, after their arrests and without delay, of their right to contact the Mexican consular post.[74] And in forty-nine cases, including Medellín's case, the court found that the United States violated Article 36, paragraphs 1(a) through (c) by failing to: (1) notify the consular post of their detention; (2) enable consular officials to communicate with and have access to them; and (3) enable consular officials to visit with them.[75] The court also found that in Medellín's case, in addition to thirty-three others, the United States violated Article 36, paragraph (c) by preventing consular officials from being able to timely

63. *Case Concerning the Vienna Convention on Consular Relations (Para. v. U.S.)*, Application of the Republic of Paraguay, Apr. 3, 1998; *see also Breard*, 523 U.S. at 374, 118 S.Ct. 1352.

64. *Breard*, 523 U.S. at 374, 118 S.Ct. 1352.

65. *Id.*

66. *Id.* at 375–76, 378, 118 S.Ct. 1352.

67. *Case Concerning the Vienna Convention on Consular Relations (Para. v. U.S.)*, Order of 10 November 1998–Discontinuance.

68. 2001 I.C.J. 104 (June 27, 2001).

69. 2004 I.C.J. 128 (Mar. 31, 2004).

70. *LaGrand*, 2001 I.C.J. 104, ¶¶ 1, 10, 14.

71. *Id.* ¶¶ 1, 38.

72. *LaGrand*, 2001 I.C.J. 104, ¶¶ 77, 90–91, 125.

73. *Id.* ¶ 128(7).

74. *Avena*, ¶¶ 106(1), 153(4).

75. *Id.* ¶¶ 106(2)-(3), 153(5)-(6).

arrange for their citizens' legal representation.[76]

After addressing the United States' and Mexico's arguments concerning the appropriate remedy for the Article 36 violations, the court concluded "that the 'review and reconsideration' prescribed by it in the *LaGrand* case should be effective."[77] Directing the United States to provide review and reconsideration of the convictions and sentences of the Mexican nationals whose individual rights under the Vienna Convention had been violated,[78] the ICJ stated:

> The rights guaranteed under the Vienna Convention are treaty rights which the United States has undertaken to comply with in relation to the individual concerned, irrespective of the due process rights under United States constitutional law. In this regard, the Court would point out that what is crucial in the review and reconsideration process is the existence of a procedure which guarantees that full weight is given to the violation of the rights set forth in the Vienna Convention, whatever may be the actual outcome of such review and reconsideration.[79]

### E. The Presidential Memorandum

After the United States Supreme Court granted certiorari in this case, the President weighed in on the controversy surrounding *Avena* by issuing a memorandum to the United States Attorney General, which states, in pertinent part, as follows:

> I have determined, pursuant to the authority vested in me as President by the Constitution and the laws of the United States of America, that the United States will discharge its inter-national obligations under the decision of the International Court of Justice in . . . [*Avena* ], by having State courts give effect to the decision in accordance with general principles of comity in cases filed by the 51 Mexican nationals addressed in that decision.[80]

## III. ANALYSIS

### A. *Avena* and The Supremacy Clause

▆▆▆ Medellín claims that the ICJ decision in *Avena* is binding federal law that preempts Section 5 of the Texas Code of Criminal Procedure. The State and the United States as *amicus curiae* disagree.

As an initial matter, while we recognize the competing arguments before us concerning whether Article 36 confers privately enforceable rights, a resolution to that issue is not required for our determination of whether *Avena* is enforceable in this Court. Our decision is controlled by the Supreme Court's recent opinion in *Sanchez–Llamas v. Oregon*, and accordingly, we hold that *Avena* is not binding federal law and therefore does not preempt Section 5.

While Medellín's case was pending before us, the Supreme Court granted certiorari in *Sanchez–Llamas v. Oregon*[81] and *Bustillo v. Johnson*,[82] consolidating the two cases to consider: "(1) whether Article 36 of the Vienna Convention grants rights that may be invoked by individuals in a judicial proceeding; (2) whether suppres-

---

**76.** *Id.* ¶¶ 106(4), 153(7).

**77.** *Id.* ¶ 138.

**78.** *Id.* ¶¶ 138, 140–41.

**79.** *Id.* ¶ 139.

**80.** Presidential Memorandum.

**81.** —— U.S. ——, 126 S.Ct. 620, 163 L.Ed.2d 503 (2005).

**82.** —— U.S. ——, 126 S.Ct. 621, 163 L.Ed.2d 503 (2005).

sion of evidence is a proper remedy for a violation of Article 36; and (3) whether an Article 36 claim may be deemed forfeited under state procedural rules because a defendant failed to raise the claim at trial."[83] The Court issued its decision in these cases during the last week of its 2005 term.[84] Although the Court found it unnecessary to decide whether Article 36 grants privately enforceable rights,[85] the Court held that the exclusionary rule is not a remedy for violations of Article 36[86] and reaffirmed its holding in *Breard*, stating "We ... conclude, as we did in *Breard*, that claims under Article 36 of the Vienna Convention may be subjected to the same procedural default rules that apply generally to other federal-law claims."[87]

When addressing petitioner Bustillo's argument that the Court should revisit its decision in *Breard* in light of the ICJ's decisions in *LaGrand* and *Avena*, the Court concluded that ICJ decisions are entitled only to "'respectful consideration.'"[88] In support of this determination, the Court cited its constitutionally mandated position as the absolute authority in defining a treaty's meaning as federal law[89] and stated that "[i]t is against this background that the United States ratified, and the Senate gave its advice and consent to, the various agreements that govern referral of Vienna Convention dis-

putes to the ICJ."[90] Looking at those agreements, the Court determined that "[n]othing in the structure or purpose of the ICJ suggests that its interpretations were intended to be conclusive on our courts."[91] The Court noted that under Article 59 of the Statute of the ICJ, an ICJ decision binds only the parties to that case and, as a result, not even the ICJ is bound by its prior decisions.[92] Reviewing Articles 59 and 34 of the Statute, the Court also considered that the "principle purpose [of the ICJ] is to arbitrate particular disputes between national governments."[93] Finally, the Court pointed out that Article 94(2) of the United Nations Charter "contemplates quintessentially *international* remedies" because an aggrieved nation may seek recourse from the Security Council when another nation fails to comply with an ICJ decision.[94] According "'great weight'"[95] to the meaning placed on the Vienna Convention by the Executive Branch, the Court then noted that even though the President has ordered state courts to give effect to *Avena*, the United States has taken the position that ICJ decisions are not binding on United States courts.[96] Finally, the Court expressed doubt about giving "decisive weight" to *LaGrand* and *Avena* when the United States has since withdrawn from the Optional Protocol.[97]

---

83. *Sanchez–Llamas*, 126 S.Ct. at 2677.

84. *Id.*

85. *Id.*

86. *Id.* at 2682.

87. *Id.* at 2687.

88. *Id.* at 2683, 2685 (quoting *Breard*, 523 U.S. at 375, 118 S.Ct. 1352).

89. *Id.* at 2684.

90. *Id.*

91. *Id.*

92. *Id.*

93. *Id.*

94. *Id.* at 2685 (original emphasis).

95. *Id.* (quoting *Kolovrat v. Oregon*, 366 U.S. 187, 194, 81 S.Ct. 922, 6 L.Ed.2d 218 (1961)).

96. *Id.*

97. *Id.*

Granting " 'respectful consideration' " [98] to the *LaGrand* and *Avena* decisions, the Court held that "the ICJ's interpretation cannot overcome the plain import of Article 36." [99] Turning to its prior decision in *Breard,* the Court stated: "the procedural rules of domestic law generally govern the implementation of an international treaty." [100] The plain language of Article 36(2)—that Article 36(1) rights "shall be exercised in conformity with the laws and regulations of the receiving State" and that those "laws and regulations must enable full effect to be given" to the intended purpose of the rights in Article 36(1) [101]— means that rules of procedural default apply to Vienna Convention claims just as they apply to claims raised under the United States Constitution. [102] The Court recognized the important role that procedural default rules play in our adversarial justice system [103] and disagreed with the ICJ's interpretation of the "full effect" language in Article 36(2). [104] Noting the problems associated with the ICJ interpretation of the "full effect" language, the Court stated:

> Article 36 claims could trump not only procedural default rules, but any number of other rules requiring parties to present their legal claims at the appropriate time for adjudication. If the State's failure to inform the defendant of his Article 36 rights generally excuses the defendant's failure to comply with relevant procedural rules, then presumably rules such as statutes of limitations

and prohibitions against filing successive habeas petitions must also yield in the face of Article 36 claims. [105]

The Court then stated that the ICJ interpretation "sweeps too broadly" [106] because Article 36(2) also requires that Article 36(1) rights " 'be exercised in conformity with the laws and regulations of the receiving State.' " [107]

In this case, we are bound by the Supreme Court's determination that ICJ decisions are not binding on United States courts. As a result, Medellín, even as one of the named individuals in the decision, cannot show that *Avena* requires us to set aside Section 5 and review and reconsider his Vienna Convention claim.

## B. The Presidential Memorandum and the Supremacy Clause

■ Aligned on the effect of the President's memorandum, both Medellín and the United States as *amicus curiae* contend that the President's February 28, 2005, memorandum preempts Section 5 and, as a result, requires us to review and reconsider Medellín's conviction and sentence as prescribed by *Avena.* In opposition, the State challenges, among other things, the effect of the memorandum's substantive language.

The United States' and Medellín's arguments presume that the President's memorandum to the United States Attorney General amounts to an executive order. [108] The State disputes this, arguing that the

**98.** *Id.* (quoting *Breard,* 523 U.S. at 375, 118 S.Ct. 1352).

**99.** *Id.*

**100.** *Id.*

**101.** Vienna Convention, art. 36(2).

**102.** *Sanchez–Llamas,* 126 S.Ct. at 2685.

**103.** *Id.* at 2685–86.

**104.** *Id.* at 2686.

**105.** *Id.*

**106.** *Id.*

**107.** *Id.* (quoting Vienna Convention, art. 36(2)).

**108.** *See generally* 44 U.S.C. §§ 1502, 1504, 1505(a)(1) (2000) (including "Presidential proclamations and Executive orders, except

memorandum does not contain any mandatory language: "While the President's memo rightly shows the intent and determination of the United States to enforce the consular provisions of the Vienna Convention, the memo does not order ... state courts to disregard controlling precedents, state statutory provisions, or state procedural default rules." [109] The State's position is not without merit, but because we conclude that Medellín has not shown that the President's memorandum entitles him to review and reconsideration, we will assume, without deciding, that the memorandum constitutes an executive order.[110]

 "Governmental power over internal affairs is distributed between the national government and the several states." [111] Describing the federal government's powers over internal affairs, the Supreme Court has acknowledged: "The broad statement that the federal government can exercise no powers except those specifically enumerated in the Constitution, and such implied powers as are necessary and proper to carry into effect the enumerated powers, is categorically true only in respect of our internal affairs." [112] With regard to external affairs, the federal government possesses exclusive power; it is "vested with all the powers of government necessary to maintain an effective control of international relations." [113] When acting in external affairs, the Presi-

those not having general applicability and legal effect or effective only against Federal agencies or persons in their capacity as officers, agents, or employees thereof ..." as documents that must be published in the Federal Register); 1 C.F.R. § 1.1 ("Document having general applicability and legal effect means any document issued under proper authority prescribing a penalty or course of conduct, conferring a right, privilege, authority, or immunity, or imposing an obligation, and relevant or applicable to the general public, members of a class, or persons in a locality, as distinguished from named individuals or organizations ..."); 1 C.F.R. § 5.2(a) (including "Presidential proclamations and Executive orders in the numbered series, and each other document that the President submits for publication or orders to be published" among documents that are required to be filed for inspection with the Federal Register and published in the Federal Register).

109. Br. of Respondent at 41.

110. *See* Kevin M. Stack, *The Statutory President*, 90 Iowa L.Rev. 539, 546–47 (2005) (observing that "there [are no] legal requirements on the types of directives that the president must issue as an executive order, as opposed to other headings, such as a proclamation, memorandum, directive, or determination" and stating that "the particular form in which a directive is conveyed does not determine its legal effect, and may reflect nothing more than a bureaucratic choice."); Tara L. Branum, *President or*

*King: The Use and Abuse of Executive Orders in Modern–Day America*, 28 J. Legis. 1, 6–7 (2002) (stating that "a congressional study has defined executive orders as 'directives or actions by the President' that have the 'force and effect of law' when 'founded on the authority of the President derived from the Constitution or a statute'" as well as noting that in addition to orders, "[p]residents may also issue proclamations, presidential signing statements, presidential memoranda, or National Security Presidential Directives, among other types of presidential directives" and stating, "[i]n general, however, the difference is typically one of form, not substance."); *see also Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 583, 72 S.Ct. 863, 96 L.Ed. 1153 (1952).

111. *United States v. Belmont*, 301 U.S. 324, 330, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); U.S. Const. amend. X; *see also Curtiss–Wright*, 299 U.S. at 316, 57 S.Ct. 216.

112. *Curtiss–Wright*, 299 U.S. at 315–16, 57 S.Ct. 216; *see also Belmont*, 301 U.S. at 330, 57 S.Ct. 758.

113. *Curtiss–Wright*, 299 U.S. at 318, 57 S.Ct. 216 (quoting *Burnet v. Brooks*, 288 U.S. 378, 396, 53 S.Ct. 457, 77 L.Ed. 844 (1933)); *see also Pink*, 315 U.S. at 233, 62 S.Ct. 552 ("Power over external affairs is not shared by the States; it is vested with the national government exclusively."); *Hines v. Davidowitz*,

dent has "plenary and exclusive power ... as the sole organ of the federal government in the field of international relations." [114] And while the President's power "must be exercised in subordination to the applicable provisions of the Constitution," such power is not necessarily dependent on specific congressional authorization.[115] The President, for example, can enter into executive agreements with foreign nations without the advice and consent of the Senate.[116] Valid agreements are accorded the same status as treaties [117] and, consequently, may preempt state law if they " 'impair the effective exercise of the Nation's foreign policy.' " [118] Executive orders issued by the President must be authorized by an act of Congress or by the Constitution.[119]

Justice Jackson, in his concurring opinion in *Youngstown Sheet & Tube Company v. Sawyer*, sought to define the scope of the President's power.[120] Recognizing that he was offering "a somewhat over-simpli-

fied grouping" because "[p]residential powers are not fixed but fluctuate, depending upon their disjunction or conjunction with those of Congress," [121] Justice Jackson related the following:

● The President's "authority is at its maximum" "[w]hen the President acts pursuant to an express or implied authorization of Congress." [122] In such circumstances, the President's power "includes all that he possesses in his own right plus all that Congress can delegate." [123]

● The President's power is in "a zone of twilight" "[w]hen the President acts in absence of either a congressional grant or denial of authority." [124] When acting in "a zone of twilight," the President is dependent on "his own independent powers." [125] And "Congress may have concurrent authority." [126] The "distribution" of authority between the President and Congress

---

312 U.S. 52, 63, 61 S.Ct. 399, 85 L.Ed. 581 (1941) ("The federal Government ... is entrusted with full and exclusive responsibility for the conduct of affairs with foreign sovereignties.").

**114.** *Curtiss–Wright*, 299 U.S. at 320, 57 S.Ct. 216.

**115.** *Id.*

**116.** *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 415, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003) ("the President has authority to make 'executive agreements' with other countries, requiring no ratification by the Senate or approval by Congress[.]"); *Dames & Moore*, 453 U.S. at 682, 101 S.Ct. 2972 ("prior cases of this Court have also recognized that the President does have some measure of power to enter into executive agreements without obtaining the advice and consent of the Senate."); *Belmont*, 301 U.S. at 331, 57 S.Ct. 758.

**117.** *Garamendi*, 539 U.S. at 416, 123 S.Ct. 2374; *Pink*, 315 U.S. at 230, 62 S.Ct. 552 ("A treaty is a 'Law of the Land' under the su-

premacy clause (art. VI, Cl.2) of the Constitution. Such international compacts and agreements as the Litvinov Assignment have a similar dignity.").

**118.** *Garamendi*, 539 U.S. at 419, 123 S.Ct. 2374 (quoting *Zschernig v. Miller*, 389 U.S. 429, 440, 88 S.Ct. 664, 19 L.Ed.2d 683 (1968)).

**119.** *Youngstown Sheet & Tube Co.*, 343 U.S. at 585, 72 S.Ct. 863.

**120.** *Id.* at 635–38, 72 S.Ct. 863 (Jackson, J., concurring).

**121.** *Id.* at 635, 72 S.Ct. 863.

**122.** *Id.*

**123.** *Id.*

**124.** *Id.* at 637, 72 S.Ct. 863.

**125.** *Id.*

**126.** *Id.*

may be "uncertain." [127] "[C]ongressional inertia, indifference or quiescence may sometimes, at least as a practical matter, enable, if not invite, measures on independent presidential responsibility." [128]

- The President's "power is at its lowest ebb" "[w]hen the President takes measures incompatible with the expressed or implied will of Congress." [129] When acting at the "lowest ebb," the President "can rely only upon his own constitutional powers minus any constitutional powers of Congress over the matter." [130] Such power, Justice Jackson advised, "must be scrutinized with caution, for what is at stake is the equilibrium established by our constitutional system." [131]

The President's memorandum cites his authority under the Constitution and laws of the United States.[132] With this in mind, we must decide whether the President has exceeded his power by directing us to give effect to the *Avena* decision under the principles of comity. The President's directive, which is dependent on his power to act in both foreign and domestic affairs, is unprecedented. What Justice Jackson proclaimed in his concurrence in *Youngstown Sheet & Tube Company* fifty-four years ago—that the judiciary "may be surprised at the poverty of really useful and unambiguous authority applicable to con-crete problems of executive power as they actually present themselves" [133]—resonates with us today.

■ We hold that the President has exceeded his constitutional authority by intruding into the independent powers of the judiciary. By stating "that the United States will discharge its inter-national obligations under the decision of the International Court of Justice in ... [*Avena* ], by having State courts give effect to the decision ... [,]" [134] the President's determination is effectively analogous to that decision. In *Sanchez–Llamas*, the Supreme Court made clear that its judicial "power includes the duty 'to say what the law is.' " [135] And that power, according to the Court, includes the authority to determine the meaning of a treaty as a "matter of federal law." [136] The clear import of this is that the President cannot dictate to the judiciary what law to apply or how to interpret the applicable law.

■ Medellín and the United States argue that the President's authority is at its maximum. In doing so, both rely on the President's inherent foreign affairs power to enter into executive agreements to settle claims with foreign nations as recognized by the Supreme Court in *United States v. Belmont*,[137] *United States v. Pink*,[138] *Dames & Moore v. Regan*,[139] and

127. *Id.*

128. *Id.*

129. *Id.*

130. *Id.*

131. *Id.* at 638, 72 S.Ct. 863.

132. Presidential Memorandum.

133. *Id.* at 634, 72 S.Ct. 863; *Dames & Moore*, 453 U.S. at 661, 101 S.Ct. 2972 ("the decisions of the Court in this area have been rare, episodic, and afford little precedential value for subsequent cases.").

134. Presidential Memorandum.

135. *Sanchez–Llamas*, 126 S.Ct. at 2684 (quoting *Marbury v. Madison*, 1 Cranch 137, 5 U.S. 137, 177, 2 L.Ed. 60 (1803)).

136. *Id.*

137. 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134.

138. 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796.

*American Insurance Association v. Garamendi.*[140] We therefore begin by reviewing these cases.

In *Belmont,* a Russian corporation, Petrograd Metal Works, deposited funds with a private New York City banker, Belmont.[141] The Soviet Government "dissolved, terminated and liquidated [Petrograd Metal Works along with other corporations], and nationalized and appropriated all of its property and assets of every kind and wherever situated, including the deposit account with Belmont."[142] The Soviet Government later assigned all amounts owed to it from United States nationals to the United States.[143]

> The [Litvinov] [A]ssignment was effected by an exchange of diplomatic correspondence between the Soviet Government and the [Executive Branch of the] United States. The purpose was to bring about a final settlement of the claims and counterclaims between the Soviet Government and the United States; and it was agreed that the Soviet Government would take no steps to enforce claims against American nationals[.][144]

The assignment was accompanied by the recognition of the Soviet Government by the President of the United States and the establishment of diplomatic relations between the two.[145]

The Supreme Court disagreed with the lower court's holding that giving effect to the Soviet nationalization decree would result in "an act of confiscation" and would be "contrary to the controlling public policy of the State of New York."[146] The Court found that the Litvinov Assignment was an international compact between the Soviet and United States governments and that the rule of a treaty's supremacy over state law applies equally to an international compact.[147] "[I]n respect of our foreign relations generally, state lines disappear. As to such purposes the State of New York does not exist."[148]

In *Pink,* the Supreme Court recognized the Litvinov Assignment's supremacy over a New York court order.[149] The state court had directed Pink, New York's Superintendent of Insurance, to pay foreign creditors' claims with assets previously held by the First Russian Insurance Company.[150] The Court ruled that the United States was entitled to those assets under the Litvinov Assignment because the Soviet Government was the successor of the First Russian Insurance Company.[151] The Court observed that the United States' claims against the Russian Government and its nationals were longstanding impediments to the United States' recognition of the Soviet Govern-

---

**139.** 453 U.S. 654, 101 S.Ct. 2972, 69 L.Ed.2d 918.

**140.** 539 U.S. 396, 123 S.Ct. 2374, 156 L.Ed.2d 376.

**141.** 301 U.S. at 325–26, 57 S.Ct. 758.

**142.** *Id.* at 326, 57 S.Ct. 758.

**143.** *Id.*

**144.** *Id.; Pink,* 315 U.S. at 222–23, 62 S.Ct. 552 (discussing its previous holding regarding the Litvinov Assignment in *Belmont* ).

**145.** *Belmont,* 301 U.S. at 330, 57 S.Ct. 758.

**146.** *Id.* at 327, 57 S.Ct. 758.

**147.** *Id.* at 330–31, 57 S.Ct. 758.

**148.** *Id.* at 331, 57 S.Ct. 758.

**149.** 315 U.S. at 227–34, 62 S.Ct. 552.

**150.** *Id.* at 211, 62 S.Ct. 552.

**151.** *Id.* at 234, 62 S.Ct. 552.

ment.[152] Acknowledging that the President has implied powers in the field of foreign relations, the Court stated:

> It was the judgment of the political department that full recognition of the Soviet Government required the settlement of all outstanding problems including the claims of our nationals. Recognition and the Litvinov Assignment were interdependent. We would usurp the executive function if we held that that decision was not final and conclusive in the courts.[153]

Relying on *Belmont,* the Court declared that the Litvinov Assignment has a "similar dignity" to a treaty under the Supremacy Clause[154] and noted that "state law must yield when it is inconsistent with, or impairs the policy or provisions of . . . an international compact or agreement."[155] The Court went on to conclude:

> The action of New York in this case amounts in substance to a rejection of a part of the policy underlying recognition by this nation of Soviet Russia. Such power is not accorded a State in our constitutional system. To permit it would be to sanction a dangerous invasion of Federal authority.[156]

In *Dames & Moore,* when diplomatic officials were held hostage after the seizure of the American Embassy in Tehran, Iran, the President issued an executive order that "blocked the removal or transfer of 'all property and interests in property of the Government of Iran, its instrumentalities and controlled entities and the Central Bank of Iran which are or become subject to the jurisdiction of the United States'" under the International Emergency Economic Powers Act (IEEPA).[157]

Iran released the hostages after it entered into an agreement with the United States to settle their claims, which included the termination of "'all litigation as between the Government of each party and the nationals of the other, and to bring about the settlement and termination of all such claims through binding arbitration.'"[158] Additionally, the United States was obligated to transfer all Iranian assets in the United States to a bank to satisfy any award made by the tribunal against Iran.[159]

The President also issued several executive orders "implementing the terms of the agreement."[160]

> These Orders revoked all licenses permitting the exercise of 'any right, power, or privilege' with regard to Iranian funds, securities, or deposits; 'nullified' all non-Iranian interests in such assets acquired subsequent to the blocking order . . .; and required those banks holding Iranian assets to transfer them 'to the Federal Reserve Bank of New York, to be held or transferred as directed by the Secretary of the Treasury.'[161]

Later, the President issued an executive order "'suspend[ing]' all 'claims which may

---

152. *Id.* at 227, 62 S.Ct. 552.

153. *Id.* at 230, 62 S.Ct. 552.

154. *Id.*

155. *Id.* at 230–31, 62 S.Ct. 552.

156. *Id.* at 233, 62 S.Ct. 552.

157. 453 U.S. at 662–63, 101 S.Ct. 2972 (quoting Exec. Order No. 12170, 3 C.F.R. 457 (1980), note following 50 U.S.C. § 1701 (1976 ed. Supp. III)).

158. *Id.* at 665, 101 S.Ct. 2972.

159. *Id.*

160. *Id.*

161. *Id.* at 665–66, 101 S.Ct. 2972 (quoting Exec. Order No. 12279, 46 Fed.Reg. 7919 (1981)).

be presented to the ... Tribunal' and provided that such claims 'shall have no legal effect in any action now pending in any court of the United States.' " [162]

Dames & Moore filed suit against the United States and the Secretary of the Treasury "to prevent enforcement of the Executive Orders and Treasury Department regulations implementing the Agreement with Iran," [163] arguing that the President exceeded his statutory and constitutional authority. [164]

The Supreme Court implemented Justice Jackson's Presidential powers framework when it considered whether the President was authorized to (1) nullify attachments made after the blocking order, (2) order the transfer of all Iranian assets to the Federal Reserve Bank, and (3) suspend pending court claims. [165] As to the first two, the Court determined that the IEEPA specifically authorized the President's actions, so those actions were, therefore, " 'supported by the strongest of presumptions and the widest latitude of judicial interpretation....' " [166] Because "[a] contrary ruling would mean that the Federal Government as a whole lacked the power exercised by the President," the Court held that Dames & Moore did not overcome the presumption in the President's favor. [167]

As to the third, the Court determined that the IEEPA and Hostage Act did not specifically authorize the President to suspend claims pending in United States courts. [168] The Court, however, found those "statutes highly relevant in the looser sense of indicating congressional acceptance of a broad scope for executive action in circumstances such as those presented in this case." [169] The Court reasoned that the IEEPA gives the President "broad authority ... to act in times of national emergency with respect to property of a foreign country," and the Hostage Act "indicates congressional willingness that the President have broad discretion when responding to the hostile acts of foreign sovereigns." [170] The Court went on to state: "[W]e cannot ignore the general tenor of Congress' legislation in this area in trying to determine whether the President is acting alone or at least with the acceptance of Congress." [171] Because "Congress cannot anticipate and legislate with regard to every possible action the President may find it necessary to take," a lack of specific congressional approval does not imply disapproval. [172] In fact, Congress may " 'invite' " the exercise of independent presidential authority where there is no indication that Congress sought to limit it and there is a history of congressional acquiescence. [173] Turning to that history, the Court observed that the United States

---

162. *Id.* at 666, 101 S.Ct. 2972 (quoting Exec. Order No. 12294, 46 Fed.Reg. 14111 (1981)).

163. *Id.* at 666–67, 101 S.Ct. 2972.

164. *Id.* at 667, 101 S.Ct. 2972.

165. *Id.* at 668, 101 S.Ct. 2972.

166. *Id.* at 674, 101 S.Ct. 2972 (quoting *Youngstown Sheet & Tube Co.*, 343 U.S. at 637, 72 S.Ct. 863 (Jackson, J., concurring)).

167. *Id.* (citing *Youngstown Sheet & Tube Co.*, 343 U.S. at 636–37, 72 S.Ct. 863 (Jackson, J., concurring)).

168. *Id.* at 675, 101 S.Ct. 2972.

169. *Id.* at 677, 101 S.Ct. 2972.

170. *Id.*

171. *Id.* at 678, 101 S.Ct. 2972.

172. *Id.*

173. *Id.* (quoting *Youngstown Sheet & Tube Co.*, 343 U.S. at 637, 72 S.Ct. 863 (Jackson, J., concurring)).

had regularly settled claims against foreign nations on behalf of its nationals by executive agreement[174] and that "Congress has implicitly approved [that] practice...."[175] Congress's acceptance of such executive action was also demonstrated by the enactment of, and frequent amendment of, the International Claims Settlement Act.[176] Furthermore, pointing to the legislative history of the IEEPA, the Court found that Congress "accepted the authority of the Executive to enter into settlement agreements."[177]

Finally, referring to *Pink*, the Court noted that its prior cases "recognized that the President does have some measure of power to enter into executive agreements without obtaining the advice and consent of the Senate."[178] The Court then held that "the inferences to be drawn from the character of the legislation Congress has enacted in the area, such as the IEEPA and the Hostage Act, and from the history of acquiescence in executive claims settlement—we conclude that the President was authorized to suspend pending claims...."[179] The Court also noted that Congress had not taken any action that would indicate that it disapproved of the agreement.[180]

In *Garamendi*, the United States President and German Chancellor entered into the German Foundation Agreement, which established a foundation funded by Germany and German companies "to compensate all those 'who suffered at the hands of German companies during the National Socialist era.'"[181] Because numerous class-action suits had been filed in the United States "against companies doing business in Germany during the National Socialist era[,]"[182] Germany's participation in the agreement "was conditioned on some expectation of security from lawsuits in United States courts[.]"[183] It was also "agreed that the German Foundation would work with the International Commission on Holocaust Era Insurance Claims (ICHEIC)[,]"[184] a voluntary organization formed before the German Foundation Agreement, which "negotiat[ed] with European insurers to provide information about unpaid insurance policies issued to Holocaust victims and settle[d] ... claims brought under them."[185]

Before the establishment of the German Foundation Agreement, the California Code of Civil Procedure had been amended to enable "state residents to sue in state court on insurance claims based on acts perpetrated in the Holocaust[.]"[186] And a California statute, the Holocaust Victim Insurance Relief Act (HVIRA), compelled insurance companies doing business in California "to disclose the details of 'life, property, liability, health, annuities, dowry, educational, or casualty insurance policies' issued 'to persons in Europe, which were in effect between 1920 and

174. *Id.* at 679–80, 101 S.Ct. 2972.

175. *Id.* at 680, 101 S.Ct. 2972.

176. *Id.* at 680–81, 101 S.Ct. 2972.

177. *Id.* at 681, 101 S.Ct. 2972.

178. *Id.* at 682, 101 S.Ct. 2972.

179. *Id.* at 686, 101 S.Ct. 2972.

180. *Id.* at 687–88, 101 S.Ct. 2972.

181. 539 U.S. at 405, 123 S.Ct. 2374.

182. *Id.*

183. *Id.*

184. *Id.* at 406, 123 S.Ct. 2374.

185. *Id.* at 407, 123 S.Ct. 2374.

186. *Id.* at 409, 123 S.Ct. 2374.

1945.'"[187] After California "subpoenas were issued against several subsidiaries of European insurance companies participating in the ICHEIC," the Deputy Secretary of State wrote Garamendi, the California insurance commissioner, and the Governor of California, informing them that HVIRA essentially threatened the establishment of the German Foundation Agreement.[188] When Garamendi vowed to "enforce HVIRA to its fullest,"[189] European and United States insurance companies and the American Insurance Association sought injunctive relief, alleging that HVIRA was unconstitutional.[190]

Before the Supreme Court, the insurance companies, the American Insurance Association, and the United States as *amicus curiae* argued that the German Foundation Agreement preempted HVIRA because it "interferes with foreign policy of the Executive Branch[.]"[191]

The Court began by observing that "[a]lthough the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'"[192] The Court then acknowledged the President's authority to enter into executive agreements and, in particular, that Congress has acquiesced to the use of those agreements to settle claims of United States nationals against foreign governments.[193] Although the insurance claims at issue were against corporations, as opposed to a foreign government, the Court found that the distinction was not determinative because the President had acted alone in the past to settle wartime claims against private parties.[194]

Confronting preemption, the Court considered the issue under its decision in *Zschernig v. Miller* because the German Foundation Agreement did not contain a preemption clause.[195] In *Zschernig*, the Court held that an Oregon escheat statute, which, as applied, prevented inheritance by nationals of Communist countries,[196] was "an 'intrusion by the State into the field of foreign affairs which the Constitution entrusts to the President and the Congress.'"[197] The *Garamendi* Court noted that *Zschernig* "relied on statements in a number of previous cases open to the reading that state action with more than incidental effect on foreign affairs is preempted, even absent any affirmative federal activity in the subject area of the state law, and hence without any showing of conflict."[198] The Court then referred to Justice Harlan's concurring opinion in *Zschernig*, in which he stated that the majority's "implication of preemption of the entire

---

187. *Id.* (quoting CAL. INS.CODE ANN. § 13804(a) (West Cum.Supp.2003)).

188. *Id.* at 411, 123 S.Ct. 2374.

189. *Id.* at 411–12, 123 S.Ct. 2374.

190. *Id.* at 412, 123 S.Ct. 2374.

191. *Id.* at 413, 123 S.Ct. 2374.

192. *Id.* at 414, 123 S.Ct. 2374 (quoting *Youngstown Sheet & Tube Co.*, 343 U.S. at 610–11, 72 S.Ct. 863 (Frankfurter, J., concurring)).

193. *Id.* at 415, 123 S.Ct. 2374.

194. *Id.* at 415–16, 123 S.Ct. 2374.

195. *Id.* at 417, 123 S.Ct. 2374 (discussing *Zschernig*, 389 U.S. 429, 88 S.Ct. 664, 19 L.Ed.2d 683).

196. 389 U.S. at 430, 432, 436, 88 S.Ct. 664.

197. *Garamendi*, 539 U.S. at 417, 123 S.Ct. 2374 (quoting *Zschernig*, 389 U.S. at 432, 88 S.Ct. 664).

198. *Id.* at 418, 123 S.Ct. 2374.

field of foreign affairs was at odds with some other cases suggesting that in the absence of positive federal action 'the States may legislate in areas of their traditional competence even though their statutes may have an incidental effect on foreign relations.' " [199]

Although the Court questioned whether it was necessary to address field and conflict preemption, it decided that even under "Justice Harlan's view, the likelihood that state legislation will produce something more than incidental effect in conflict with express foreign policy of the National Government would require preemption of the state law." [200] Nevertheless, because Justice Harlan believed that state legislation within its traditional competence may enable the state to prevail, the Court determined "it would be reasonable to consider the strength of the state interest, judged by standards of traditional practice, when deciding how serious a conflict must be shown before declaring the state law preempted." [201]

Evaluating the President's action first, the Court concluded that the German Foundation Agreement was "within the traditional subject matter of foreign policy in which national, not state, interests are overriding. . . ." [202] The Court acknowledged that

> [t]he approach taken serves to resolve the several competing matters of national concern apparent in the German Foundation Agreement: the national interest in maintaining amicable relationships with current European allies; survivors' interests in a 'fair and prompt' but nonadversarial resolution of their claims so as to 'bring some measure of justice . . . in their lifetimes'; and the companies' interest in securing 'legal peace' when they settle claims in this fashion.[203]

Looking then to California's interests, the Court determined those interests were weak when considered "against the backdrop of traditional state legislative subject matter[.]" [204] Although California had an interest in consumer protection, the Court noted that by limiting HVIRA to certain policies, it was "doubt[ful] that the purpose of the California law [was] an evaluation of corporate reliability in contemporary insuring in the State." [205] The Court also considered California's interest in vindicating "the claims of Holocaust survivors" but determined "that the very same objective dignifies the interest of the National Government in devising its chosen mechanism for voluntary settlements, there being about 100,000 survivors in the country, only a small fraction of them in California." [206]

The Court held that the German Foundation Agreement preempted HVIRA, reasoning, that: HVIRA "undercuts the President's diplomatic discretion and the choice he has made exercising it"; [207] "the President's authority to provide for settling claims in winding up international hostilities requires flexibility in wielding 'the coercive power of the national economy' as a

---

**199.** *Id.* (quoting *Zschernig*, 389 U.S. at 459, 88 S.Ct. 664 (Harlan, J., concurring)).

**200.** *Id.* at 419–20, 123 S.Ct. 2374.

**201.** *Id.* at 420, 123 S.Ct. 2374.

**202.** *Id.* at 421, 123 S.Ct. 2374.

**203.** *Id.* at 422–23, 123 S.Ct. 2374.

**204.** *Id.* at 425, 123 S.Ct. 2374.

**205.** *Id.* at 426, 123 S.Ct. 2374.

**206.** *Id.*

**207.** *Id.* at 423–24, 123 S.Ct. 2374.

tool of diplomacy"; [208] and "HVIRA is an obstacle to the success of the National Government's chosen 'calibration of force' in dealing with the Europeans using a voluntary approach." [209]

Turning to the case before us, we conclude that the reliance on the President's power to enter into executive agreements to settle disputes with other nations, and even corporations under the limited circumstances described in *Garamendi*, by Medellín and the United States is misplaced. The President has not entered into any such agreement with Mexico relating to the Mexican nationals named in the *Avena* decision. There has been no settlement. Rather, the presidential memorandum is a unilateral act executed in an effort to achieve a settlement with Mexico.

The President's independent foreign affairs power to enter into an executive agreement to settle a dispute with a foreign nation under Article II of the Constitution [210] "has received congressional acquiescence throughout its history...." [211] But there is no similar history of congressional acquiescence relating to the President's authority to unilaterally settle a dispute with another nation by executive order, memorandum, or directive. [212] So, when issuing the February 28, 2005, memorandum, the President's authority was not at its maximum because the President did not act "pursuant to an express or implied authorization of Congress[.]" [213] With the President's power not being at its zenith here, we must ask whether the President has acted in the "absence of either a congressional grant or denial of authority[.]" [214] Implied congressional ratification of the President's settling of claims with foreign nations is a "practice [that] goes back over 200 years to the first Presidential administration...." [215] Here, the President's unprecedented unilateral action of issuing this memorandum does not fall into the category of presidential power employed in a "zone of twilight" or where "congressional inertia, indifference or quiescence" enabled or invited the conduct of the President. [216] In this context, it is evident that the President's independent power to settle a dispute with a foreign nation, recognized throughout the nation's history, depends on the existence

---

208. *Id.* at 424, 123 S.Ct. 2374 (quoting *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 377, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000)).

209. *Id.* at 425, 123 S.Ct. 2374 (quoting *Crosby*, 530 U.S. at 380, 120 S.Ct. 2288).

210. U.S. CONST. art. II, § 1, cl. 1.

211. *Garamendi*, 539 U.S. at 415, 123 S.Ct. 2374.

212. *See Youngstown Sheet & Tube Co.*, 343 U.S. at 610–11, 72 S.Ct. 863 (Frankfurter, J., concurring) (stating that "a systematic, unbroken, executive practice, long pursued to the knowledge of the Congress and never before questioned, engaged in by Presidents who have also sworn to uphold the Constitution, making as it were such exercise of power part of the structure of our government, may be treated as a gloss on 'executive power' vested in the President by § 1 of Art. II.").

213. *Id.* at 635, 72 S.Ct. 863 (Jackson, J., concurring); *see also Dames & Moore*, 453 U.S. at 686, 101 S.Ct. 2972 ("Past practice does not, by itself, create power, but 'long-continued practice, known to and acquiesced in by Congress, would raise a presumption that the action had been taken in pursuance of its consent ....'") (quoting *United States v. Midwest Oil Co.*, 236 U.S. 459, 474, 35 S.Ct. 309, 59 L.Ed. 673 (1915)).

214. *Youngstown Sheet & Tube Co.*, 343 U.S. at 637, 72 S.Ct. 863 (Jackson, J., concurring).

215. *Garamendi*, 539 U.S. at 415, 123 S.Ct. 2374.

216. *Youngstown Sheet & Tube Co.*, 343 U.S. at 637, 72 S.Ct. 863 (Jackson, J., concurring).

of an executive agreement. Given the extraordinary conduct of the President, unsupported by a history of congressional acquiescence, we find that the President's chosen method for resolving this country's dispute with Mexico is "incompatible with the ... implied will of Congress[.]"[217] Accordingly, in this instance, we find that the exercise of the President's foreign affairs power "is at its lowest ebb[.]"[218] Having acted contrary to the implied will of Congress, we conclude that the President has exceeded his inherent constitutional foreign affairs authority by directing state courts to comply with *Avena*.

The United States submits that requiring a formal bilateral agreement would (1) " 'hamstring the President in settling international controversies'[219] and weaken this nation's ability to fulfill its treaty obligations"; (2) "fail to recognize the practical reality that there are occasions when a foreign government may acquiesce in a resolution that it is unwilling to formally approve"; (3) "fail to recognize that obtaining a formal agreement can be a time consuming process that is ill-suited for occasions when swift action is required"; and (4) "have the perverse effect of assigning to a foreign government veto power over the President's exercise of his authority over foreign affairs."[220]

Contrary to the United States' contentions, requiring a formal bilateral agreement does not limit or constrain the President's ability to settle international controversies or comply with treaty obligations. The President's ability to negotiate and enter into an executive agreement to settle a dispute with a foreign nation remains. In this case, however, the President failed to avail himself of that mechanism to settle this nation's dispute with Mexico. And although it may be time-consuming to obtain an executive agreement, the need for "swift action" does not override what the Constitution requires—an international compact or agreement.

A necessary component of any executive agreement is the negotiation process that precedes it, which ensures that each sovereignty is represented and heard. What is ultimately achieved through that process, which invariably involves compromise, will reflect a meeting of the minds—a settlement that embodies the terms, conditions, rights, and obligations agreed to during the negotiation process. At odds with this is the notion that a "foreign government may acquiesce in a resolution that it is unwilling to formally approve." A Presidential resolution that is based on an evaluation of the means necessary to resolve a dispute and then implemented in anticipation of future acquiescence by a foreign government is not a settlement. The mere possibility of later acquiescence by a foreign government is speculation. Representatives of foreign governments change, and with them, international relations are subject to modification. When it comes to foreign relations, history has proven that a nation deemed an ally on one day, may on the next, be declared an enemy. Finally, the view that an executive agreement allows "a foreign government veto power over the President's exercise of his foreign affairs powers" undermines the purpose of the negotiation process—the accomplishment of an actual settlement.

217. *Id.*

218. *Id.*

219. Br. of United States as *Amicus Curiae,* at 30 (quoting *Garamendi,* 539 U.S. at 416, 123 S.Ct. 2374).

220. *Id.*

The absence of an executive agreement between the United States and Mexico is central to our determination that the President has exceeded his inherent foreign affairs power by ordering us to comply with *Avena.* We must make clear, however, that our decision is limited to the issue before us—the effect of the President's February 28, 2005, memorandum. Therefore, we express no opinion about whether an executive agreement between the United States and Mexico providing for state court compliance with *Avena* would preempt state law.

Medellín also relies on the President's duty to faithfully execute the laws as provided in Article II, Section 3 of the Constitution.[221] According to Medellín, the President "has both the authority and the duty to enforce the United States's treaty obligations within the domestic legal system" because, under the Supremacy Clause, treaties are supreme.[222] Related to this argument is Medellín's contention that

> the President has done nothing more than confirm that the United States will do what it has already promised to do— abide by the decision of the ICJ in a dispute concerning the interpretation and application of the Vienna Convention. That promise was made by [a] constitutionally prescribed process when the President, with the advice and consent of the Senate, entered into the Vienna Convention, the Optional Protocol, the U.N. Charter, and the ICJ Statute.[223]

The Supreme Court's determination about the domestic effect of ICJ decisions—that they are entitled only to " 'respectful consideration' "[224]—based on its interpretation of the Statute of the ICJ and the United Nations Charter in *Sanchez–Llamas*[225] forecloses any argument that the President is acting within his authority to faithfully execute the laws of the United States. By directing state courts to give effect to *Avena,* the President has acted as a lawmaker. But, as Justice Black explained in *Youngstown Sheet & Tube,* "[i]n the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker."[226] The President's February 28, 2005, determination cannot be sustained under the power of the Executive to ensure that the laws are faithfully executed.

Relying again on the enumerated powers of the President, Medellín also contends that "[t]he Constitution explicitly vests the President with authority over diplomatic and consular relations."[227] He argues: "No power is more clearly Presidential than the authority to protect U.S. citizens and their interests abroad."[228] He contends that the ability of the United States to protect its citizens may be compromised if the United States does not comply with *Avena.* Looking to statutory authority, Medellín maintains that by virtue of Title 22 United States Code, Sections 1732 and 402(a)(1)(D), "Congress has specifically referenced the President's duty

---

**221.** U.S. Const. art. II, § 3.

**222.** Br. of Applicant at 50.

**223.** *Id.* at 45.

**224.** *Sanchez–Llamas,* 126 S.Ct. at 2685 (quoting *Breard,* 523 U.S. at 375, 118 S.Ct. 1352).

**225.** *Id.* at 2684–85.

**226.** *Youngstown Sheet & Tube Co.,* 343 U.S. at 587, 72 S.Ct. 863.

**227.** Br. of Applicant at 48 (citing U.S. Const. art. II, §§ 2, cl. 2, 3).

**228.** *Id.*

in the context of protecting U.S. citizens who have been detained or arrested in foreign lands, ... and in requiring the President to protect foreign nationals in the United States[.]" [229]

Under Article II, Section 2, Clause 2 of the Constitution, the President "by and with the Advice and Consent of the Senate, shall appoint Ambassadors, other public Ministers and Consuls...." [230] And under Article II, Section 3, the President "shall receive Ambassadors and other public Ministers...." [231]

The Hostage Act, Title 22, United States Code, Section 1732, states:

> Whenever it is made known to the President that any citizen of the United States has been unjustly deprived of his liberty by or under the authority of any foreign government, it shall be the duty of the President forthwith to demand of that government the reasons of such imprisonment; and if it appears to be wrongful and in violation of the rights of American citizenship, the President shall forthwith demand the release of such citizen, and if the release so demanded is unreasonably delayed or refused, the President shall use such means, not amounting to acts of war and not otherwise prohibited by law, as he may think necessary and proper to obtain or effectuate the release; and all the facts and proceedings relative thereto shall as soon as practicable be communicated by the President to Congress. [232]

Further, Title 22, United States Code, Section 4802, which defines the "Responsibility of the Secretary of State," provides in relevant part:

> (a) Security functions.
>
> (1) The Secretary of State shall develop and implement (in consultation with the heads of other Federal agencies having personnel or missions abroad where appropriate and within the scope of the resources made available) policies and programs, including funding levels and standards, to provide for the security of United States Government operations of a diplomatic nature and foreign government operations of a diplomatic nature in the United States. Such policies and programs shall include—
>
> * * *
>
> (D) protection of foreign missions, international organizations, and foreign officials and other foreign persons in the United States, as authorized by law. [233]

We have no doubt that the President and other executive branch officials play a vital role in protecting the interests of American citizens abroad when necessary. However, we do not construe the constitutional provisions as expressly or implicitly granting the President the authority to mandate state court compliance with the ICJ *Avena* decision, and Medellín cites no precedent that would lead us to conclude otherwise.

▬ Nor can the statutes be read to authorize the President's independent action in this case. First, there is no indication that the Hostage Act specifically grants the President unlimited power to act when the President's objective is to protect the interests of American citizens traveling or residing abroad. In *Dames &*

---

**229.** *Id.* at 49 (citing 22 U.S.C. §§ 1732, 4802(a)(1)(D)).

**230.** U.S. Const. art. II, § 2, cl. 2.

**231.** U.S. Const. art. II, § 3.

**232.** 22 U.S.C. § 1732 (2000).

**233.** 22 U.S.C. § 4802(a)(1)(D) (2000).

*Moore,* the Supreme Court reviewed the legislative history of the Hostage Act:

> Congress in 1868 was concerned with the activity of certain countries refusing to recognize the citizenship of naturalized Americans traveling abroad, and repatriating such citizens against their will. These countries were not interested in returning the citizens in exchange for any sort of ransom. This also explains the reference in the Act to imprisonment 'in violation of the rights of American citizenship.' [234]

The Court further observed that the proponents of the Act "argued that 'something must be intrusted to the Executive' and that 'the President ought to have the power to do what the exigencies of the case require to rescue a citizen from imprisonment.'" [235] When determining whether the President had the authority to suspend claims in American courts, the Court found that the Hostage Act "indicates congressional willingness that the President have broad discretion when responding to the hostile acts of foreign sovereigns." [236] But implied congressional authority vested in the President to protect United States citizens in response to the hostile acts of another nation where the circumstances are exigent shows that the President's power to protect United States citizens abroad is not unqualified. We cannot accept Medellín's argument that the Hostage Act grants the President unfettered authority to act to protect the interest of United States citizens abroad. It strains

logic to conclude that the power delegated to the President under the Hostage Act permits the President to engage in any conduct that will ensure the maintenance of that power. Nevertheless, we need not decide the scope of any implied power conferred to the President under the Hostage Act, because, as we have already concluded in this case, "there is [not] a history of congressional acquiescence in conduct of the sort engaged in by the President." [237] When concluding that the President had the authority to suspend pending court claims in *Dames & Moore,* the Court relied on not only the President's power under the Hostage Act, but on the President's power under the International Emergency Economic Powers Act and the President's power to settle claims with foreign nations by executive agreement. [238] In doing so, the Court specifically noted: "Crucial to our decision today is the conclusion that Congress has implicitly approved the practice of claim settlement by executive agreement." [239] We decline to find that the Hostage Act authorizes the President to order this Court to comply with *Avena.*

■ Although Section 4802(a)(1)(D), Title 22, United States Code, provides that the Secretary of State [240] has the duty to protect "foreign missions, international organizations, and foreign officials and other foreign persons in the United States," that duty extends only to things "'authorized by law.'" [241] The statute, therefore, cannot be regarded as an independent source of authority for the President's memoran-

---

234. 453 U.S. at 676, 101 S.Ct. 2972 (internal citations omitted).

235. *Id.* at 678, 101 S.Ct. 2972.

236. *Id.* at 677, 101 S.Ct. 2972.

237. *Id.* at 678–79, 101 S.Ct. 2972.

238. *Id.* at 677–82, 686, 101 S.Ct. 2972.

239. *Id.* at 680, 101 S.Ct. 2972.

240. 22 U.S.C. § 2651 (2000) ("There shall be at the seat of government an executive department to be known as the 'Department of State', and a Secretary of State, who shall be the head thereof.").

241. 22 U.S.C. § 4802(a)(1)(D).

dum ordering state courts to comply with *Avena.*

■ In further support of its position that the President has the authority to direct state courts to give effect to the ICJ *Avena* decision, the United States directs us to the United Nations Charter and the United Nations Participation Act. The United States maintains that the ratification of the Charter "implicitly grants the President 'the lead role' in determining how to respond to an ICJ decision." [242] And under the United Nations Participation Act, according to the United States, the President, through appointed officials, "represents the United States in the United Nations, including before the ICJ and in the Security Council." [243] Moreover, the United States argues that Congress "expressly anticipated that these officials would ... perform 'other functions in connection with the participation of the United States in the United Nations' at the direction of the President or his representative to the United Nations." [244]

Titled "Representation in Organization," Title 22, United States Code, Section 287 provides in part:

(a) Appointment of representative; rank, status and tenure; duties. The President, by and with the advice and consent of the Senate, shall appoint a representative of the United States to the United Nations who shall have the rank and status of Ambassador Extraordinary and Plenipotentiary and shall hold office at the pleasure of the President. Such representative shall represent the United States in the Security Council of the United Nations and may serve ex officio as representative of the United States in any organ, commission, or other body of the United Nations other than specialized agencies of the United Nations, and shall perform such other functions in connection with the participation of the United States in the United Nations as the President may, from time to time, direct.

(b) Appointment of additional representatives; rank, status and tenure; duties; reappointment unnecessary. The President, by and with the advice and consent of the Senate, shall appoint additional persons with appropriate titles, rank, and status to represent the United States in the principal organs of the United Nations and in such organs, commissions, or other bodies as may be created by the United Nations with respect to nuclear energy or disarmament (control and limitation of armament). Such persons shall serve at the pleasure of the President and subject to the direction of the Representative of the United States to the United Nations. They shall, at the direction of the Representative of the United States to the United Nations, represent the United States in any organ, commission, or other body of the United Nations, including the Security Council, the Economic and Social Council, and the Trusteeship Council, and perform such other functions as the Representative of the United States is authorized to perform in connection with the participation of the United States in the United Nations. Any Deputy Representative or any other officer holding office at the time the provisions of this Act, as amended, become effective shall not be required to

**242.** Br. of United States as *Amicus Curiae,* at 20–21 (quoting *Garamendi,* 539 U.S. at 415, 123 S.Ct. 2374).

**243.** *Id.* at 20.

**244.** *Id.* (quoting 22 U.S.C. § 287(a), (b) (2000)).

be reappointed by reason of the enactment of this Act, as amended.[245]

Starting with the United Nations Charter, we hold it does not authorize the type of action that the President has taken here. The President is still bound by the Constitution when deciding how the United States will respond to an ICJ decision,[246] and, as stated above, the President exceeded his implied foreign affairs power by directing state courts to give effect to *Avena*.

■■■■■ Additionally, the subsections of the United Nations Participation Act set forth above do not support the President's determination. Because the participation of the United States in proceedings before the ICJ does not bind the courts of this country to comply with a decision of the ICJ,[247] it necessarily follows that the participation of the United States in the United Nations does not authorize the President to order state courts to give effect to any decision rendered by the ICJ.

Based on the foregoing, we hold that the President's memorandum ordering us to give effect to the ICJ *Avena* decision cannot be sustained under the express or implied constitutional powers of the President relied on by Medellín and the United States or under any power granted to the President by an act of Congress cited by Medellín and the United States.[248] As such, the President has violated the separation of powers doctrine by intruding into the domain of the judiciary, and therefore, Medellín cannot show that the President's memorandum preempts Section 5.

## C. Section 5(a)(1), Article 11.071 of the Texas Code of Criminal Procedure

We now consider whether Medellín has satisfied the requirements of Article 11.071, Section 5(a)(1) of the Texas Code of Criminal Procedure so as to permit this Court to review and reconsider his Vienna Convention claim. Section 5(a)(1) provides:

If a subsequent application for a writ of habeas corpus is filed after filing an initial application, a court may not consider the merits of or grant relief based on the subsequent application unless the application contains sufficient specific facts establishing that:

the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article ... because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application[.] [249]

Medellín contends that the *Avena* decision and the Presidential memorandum serve as previously unavailable factual and legal bases because both issued after his first application was denied. The State maintains that the legal basis for Medellín's claim, the Vienna Convention, was available before his trial and when he filed his first application. Medellín claims, however, that he is not reasserting the same claim presented on his first application; he contends that the *Avena* decision and the President's memorandum provide him with the right to prospective review and reconsideration. We will address whether the

---

**245.** 22 U.S.C. § 287(a), (b).

**246.** *Curtiss–Wright Export Corp.,* 299 U.S. at 320, 57 S.Ct. 216.

**247.** *Sanchez–Llamas,* 126 S.Ct. at 2685.

**248.** *Youngstown Sheet & Tube Co.,* 343 U.S. at 585, 72 S.Ct. 863.

**249.** Tex.Code Crim. Proc. art. 11.071 § 5(a)(1).

*Avena* decision or the Presidential memorandum qualify as a new factual or legal basis under Section 5(a)(1) separately.

### 1. Factual Basis

Section 5(e) of Article 11.071 states:

For purposes of Subsection (a)(1), a factual basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the factual basis was not ascertainable through the exercise of reasonable diligence on or before that date.[250]

■ What constitutes a "factual basis" under Section 5(a)(1) is not defined. Therefore, to determine whether *Avena* or the President's memorandum qualify as a previously unavailable factual basis under Section 5(a)(1), we must perform a statutory-construction analysis to determine the meaning of "factual."

■ When interpreting a statute, "we seek to effectuate the 'collective' intent or purpose of the legislators who enacted the legislation."[251] In doing so, we examine the "literal text"[252] of a statute, which includes all words and phrases,[253] "to discern the fair, objective meaning of that text at the time of its enactment."[254] And "if the meaning of the statutory text, when read using the established canons of construction relating to such text, should have been plain to the legislators who voted on it, we ordinarily give effect to that plain meaning."[255] We will not give effect to the plain meaning of a statute's text if, when applied, it leads to an absurd result that could not have been intended by the Legislature.[256] When the application of a statute's literal text leads to an absurd result, or the text is ambiguous, we consult extratextual sources to determine a statute's meaning.[257]

In determining the plain meaning of "factual" in Section 5(a)(1), we are guided by the applicable canons of construction, Article 3.01 of the Code of Criminal Procedure, which governs how words in the Code are to be understood,[258] and Section 311.011 of the Texas Government Code (the Code Construction Act), which provides for the common and technical use of words in the Code.[259] Article 3.01 of the Code of Criminal Procedure states that "[a]ll words, phrases and terms used in this Code are to be taken and understood in their usual acceptation in common language, except where specially defined."[260] The Code Construction Act provides: "Words and phrases shall be read in context and construed according to the rules of grammar and common usage."[261]

To discern what the usual acceptation of the word "factual" is in common language or how it is construed according to the rules of common usage, we look to dictionary definitions.[262] The word "factual,"

250. Tex. Code Crim. Proc. art. 11.071 § 5(e).

251. *Boykin v. State*, 818 S.W.2d 782, 785 (Tex.Crim.App.1991).

252. *Id.*

253. *Nguyen v. State*, 1 S.W.3d 694, 696 (Tex. Crim.App.1999).

254. *Boykin*, 818 S.W.2d at 785.

255. *Id.*

256. *Id.*

257. *Id.* at 785–86.

258. Tex. Code Crim. Proc. art. 3.01 (Vernon 2004).

259. Tex. Gov't Code §§ 311.002, 311.011 (Vernon 2003).

260. Tex. Code Crim. Proc. art. 3.01.

261. Tex. Gov't Code § 311.011(a).

262. *Ex parte Rieck*, 144 S.W.3d 510, 512 (Tex. Crim.App.2004); *Lane v. State*, 933 S.W.2d 504, 515 n. 12 (Tex.Crim.App.1996) (citing

according to *Webster's Third New International Dictionary,* means "of, relating to, or concerned with facts" and "restricted to, involving, or based on fact...."[263] The *Dictionary of Modern American Usage* offers two additional definitions—"of or involving facts" and "true."[264] Illustrating the difference between the two definitions, the *Dictionary of Modern American Usage* states that the first meaning "appears in phrases such as *factual finding* and *factual question,*" while the second meaning "appears in phrases such as *factual account* and *factual narrative.*"[265] The meaning of "factual" in Section 5(a)(1) falls within the first category of phrases described in the *Dictionary of Modern American Usage* because "factual" is paired with the word "basis." We turn our attention to the meaning of the word "fact" according to its usual acceptation in common language and the rules of common usage.

Our review of multiple dictionaries reveals that there are numerous definitions for the word "fact."[266] For instance, *Webster's Third New International Dictionary* alone contains six definitions.[267] Although there are a variety of definitions for the word "fact," it must be considered in the context in which it appears.[268] We find it instructive that the Legislature expressly distinguished factual basis (fact) from legal basis (law) in Section 5(a)(1). This distinction accounts for the two necessary, but separate, parts of any subsequent claim: the factual basis and the legal basis. With this in mind, we find that the following definition of "fact" from *Black's Law Dictionary* accurately reflects the Legislature's intent: "[a]n actual or alleged event or circumstance, as distinguished from its legal effect, consequence, or interpretation."[269] Giving effect to the plain meaning of "fact" does not lead to an absurd result that the Legislature could not have intended. It is the application of the law to a fact or set of facts that yields the legal effect, consequence, or interpretation. And in some cases, the legal effect, consequence, or interpretation creates a new rule of law.[270]

---

*Bingham v. State,* 913 S.W.2d 208, 209–10 (Tex.Crim.App.1995)) (reaffirming "that use of dictionary definitions of words contained in the statutory language is part of the 'plain meaning' analysis that an appellate court initially conducts [under *Boykin* ] to determine whether or not the statute in question is ambiguous.").

**263.** Webster's Third New International Dictionary 813 (2002).

**264.** A Dictionary of Modern American Usage 284 (1998).

**265.** *Id.* at 284–85 (original emphasis).

**266.** *See* Webster's Third New International Dictionary 813 (2002); The American Heritage College Dictionary 489 (3d ed.2000); Black's Law Dictionary 610 (7th ed.1999); A Dictionary of Modern Legal Usage 346 (2d ed.1995); The Random House Dictionary of the English Language 691 (2d ed.1987); A Concise Dictionary of Law 144 (1983); Jowitt's Dictio-

nary of English Law 764 (2d ed.1977); Ballentine's Law Dictionary 449 (3d ed.1969).

**267.** Webster's Third New International Dictionary 813.

**268.** Tex. Gov't Code § 311.011; *Lane,* 933 S.W.2d at 515 n. 12.

**269.** Black's Law Dictionary 610.

**270.** *See, e.g., Roper v. Simmons,* 543 U.S. 551, 568, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) ("A majority of States have rejected the imposition of the death penalty on juvenile offenders under 18, and we now hold this is required by the Eighth Amendment."); *Crawford v. Washington,* 541 U.S. 36, 68, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ("the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination."); *Atkins v. Virginia,* 536 U.S. 304, 321, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002) ("Construing and applying the

The actual event or circumstance involved in Medellín's case is that law enforcement authorities did not inform Medellín of his right to contact the Mexican consulate after his arrest as required by Article 36(1)(b). This fact provided the factual basis for Medellín's challenge to his conviction and sentence under the Vienna Convention on his first application for a writ of habeas corpus. We disposed of this claim on an independent state ground.[271] Agreeing with the trial court, we found that the legal effect or consequence of Medellín's Vienna Convention claim resulted in the application of our state procedural default rule due to Medellín's failure to object at trial.[272]

 Medellín now argues that *Avena* is a previously unavailable factual basis for purposes of Section 5(a)(1). We disagree. For purposes of Section 5(a)(1), the *Avena* decision is properly categorized as law, even though it is not binding on us.[273] The ICJ's decision in *Avena* is not a fact and, therefore, does not qualify as a previously unavailable factual basis under Section 5(a)(1).

 As to the President's memorandum, Medellín asserts that "[a] judgment giving rise to new claims issued after an applicant's habeas application renders the factual basis of the claim 'unavailable' un-

der Section 5(a)."[274] Thus, he urges, the President's memorandum is a new "factual basis" entitling him to review. We also disagree with this argument.

Medellín broadly claims that "whether considered as a factual or legal basis ... the President's Determination was [not] available at the time of his initial application for purposes of Section 5(a)" without further explanation as to how the memorandum constitutes a "factual" basis.[275] Medellín's arguments, however, address the memorandum exclusively as a legal, not factual, basis; he argues that the President's memorandum "constitutes a binding federal rule of decision." But even if Medellín had devised a complete argument that the President's memorandum constitutes a "factual basis," we would still reach the same conclusion. The President's memorandum directs the state courts to give effect to the ICJ *Avena* decision, and in so doing, the President specifically relies on his authority under "the Constitution and the laws of the United States of America...."[276] This indicates that the President intended his memorandum to have the effect of law. According to our earlier analysis of "factual," we determined that the word means "of or involving"[277] "[a]n actual or alleged event or circumstance, as distinguished from its legal ef-

---

Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender."); *Apprendi v. New Jersey,* 530 U.S. 466, 490, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000) (holding that under the Fifth, Sixth and Fourteenth Amendments, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.").

**271.** *Ex parte Medellín,* No. WR–50,191–01 (Tex.Crim.App. Oct. 3, 2001) (not designated for publication).

**272.** *Id.*

**273.** *Sanchez–Llamas,* 126 S.Ct. at 2682.

**274.** Br. of Applicant at 54.

**275.** *Id.*

**276.** Presidential Memorandum.

**277.** A Dictionary of Modern American Usage 284 (1998).

fect, consequence, or interpretation."[278] Here, even though we have concluded that the President's memorandum is not binding federal law as argued by Medellín and the United States, we cannot say that the memorandum falls into that definition. For purposes of Section 5(a)(1), like the *Avena* decision, the President's memorandum is properly classified as a "legal basis," not a factual one.

### 2. Legal Basis

■ Because neither the *Avena* decision nor the President's memorandum constitute a "factual basis," we now consider whether either qualifies as a previously unavailable "legal basis" under Section 5(a)(1). Section 5(d) of Article 11.071 states:

> a legal basis of a claim is unavailable on or before a date described by Subsection (a)(1) if the legal basis was not recognized by or could not have been reasonably formulated from a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state on or before that date.[279]

Although the *Avena* decision and the Presidential memorandum were not available when Medellín filed his first application, neither constitutes a new legal basis under the plain language of Section 5(d).[280] First, neither has been recognized as providing a right to review and reconsideration in "a final decision of the United States Supreme Court, a court of appeals of the United States, or a court of appellate jurisdiction of this state...."[281] Indeed, as we noted earlier, the United States Supreme Court recently reaffirmed its holding in *Breard*—that procedural default rules may bar Vienna Convention claims.[282] In *Sanchez–Llamas,* the Supreme Court concluded that *Avena* is entitled to only " 'respectful consideration,' "[283] and as such, that decision is not binding on us. Likewise, because we have concluded that the President has exceeded his authority by ordering state courts to give effect to *Avena,* the President's determination is not binding federal law. Because *Avena* and the President's memorandum are not binding law, neither of them can serve as a previously unavailable legal basis for purposes of Section 5(a)(1).

## IV. CONCLUSION

Having found that the ICJ *Avena* decision and the Presidential memorandum do not constitute binding federal law that preempt Section 5 under the Supremacy Clause of the United States Constitution and that neither qualify as a previously unavailable factual or legal basis under Section 5(a)(1), we dismiss Medellín's subsequent application for a writ of habeas corpus under Article 11.071, Section 5.

WOMACK, J., concurs in the result.

KELLER, P.J., filed a concurring opinion.

PRICE, J., filed a concurring opinion.

HERVEY, J., filed a concurring opinion.

COCHRAN, J., filed a concurring opinion in which JOHNSON, and HOLCOMB, JJ., joined.

---

278. BLACK'S LAW DICTIONARY 610.

279. TEX.CODE CRIM. PROC. art. 11.071 § 5(d).

280. *Boykin,* 818 S.W.2d at 785.

281. TEX.CODE CRIM. PROC. art. 11.071 § 5(d).

282. *Sanchez–Llamas,* 126 S.Ct. at 2687.

283. *Id.* at 2683 (quoting *Breard,* 523 U.S. at 375, 118 S.Ct. 1352).

KELLER, P.J., concurring.

On behalf of the United States as amicus curiae, the U.S. Attorney General's office has taken the position that President Bush's memorandum constitutes an order requiring this Court to ignore rules of procedural default (including rules governing contemporaneous objections at trial and statutes governing subsequent habeas corpus applications) and evaluate anew whether applicant was prejudiced by a failure to comply with the Vienna Convention on Consular Relations. I conclude that the President of the United States does not have the power to order a state court to conduct such a review.

"Although the source of the President's power to act in foreign affairs does not enjoy any textual detail, the historical gloss on the 'executive Power' vested in Article II of the Constitution has recognized the President's 'vast share of responsibility for the conduct of our foreign relations.'"[1] Nevertheless, the executive's power in this regard is not without limits, as it must still be "exercised in subordination to the applicable provisions of the Constitution."[2] Among the principles enshrined in the United States Constitution is that of federalism—the separate sovereignty of the state and federal governments—embodied in the structure of the Constitution,[3] as well as in the Tenth Amendment.[4] Although federalism was "the unique contribution of the Framers [of the U.S. Constitution] to political science and political theory," there remains "much uncertainty respecting the existence, and the content, of standards that allow the Judiciary to play a significant role in maintaining the design contemplated by the Framers."[5] Nevertheless, I agree with Justice Kennedy that "the federal balance is too essential a part of our constitutional structure and plays too vital a role in securing freedom for [the judiciary] to admit inability to intervene when one or the other level of Government have tipped the scales too far."[6]

In line with Justice Kennedy's pronouncement, the United States Supreme Court has increasingly stepped forward to prevent the national government from intruding into the sphere of state power. The Court has adopted a general policy against federal injunctive interference with the course of a pending state criminal prosecution.[7] The Court has struck down Congressional enactments relating to crim-

1. *American Ins. Assn. v. Garamendi,* 539 U.S. 396, 414, 123 S.Ct. 2374, 156 L.Ed.2d 376 (2003)(quoting in part *Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. 579, 610–611, 72 S.Ct. 863, 96 L.Ed. 1153 (1952)(Frankfurter, J., concurring)).

2. *Id.* at 416 n. 9, 123 S.Ct. 2374.

3. *See* U.S. Const., Arts. I, § 2 (members of the House of Representatives elected by people "of the several States"), § 3 (Senate composed of two senators from each state), § 4 (time, place and manner of elections for representatives and senators prescribed by each state), § 10 (specific prohibitions against the states), II, § 1 (states appoint presidential electors), IV, § 1 (full faith and credit between states), § 2 (privileges and immunities of citizens of the states), § 3 (admission of new states into the union), § 4 (duties of U.S. to its states), V (state ratification of amendments proposed by Congress).

4. U.S. Const., Amend X: "The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."

5. *United States v. Lopez,* 514 U.S. 549, 575, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995)(Kennedy, J., concurring).

6. *Id.* at 578, 115 S.Ct. 1624.

7. *Younger v. Harris,* 401 U.S. 37, 45–54, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)(abstention doctrine).

inal justice that concerned traditional areas of state authority[8] and that imposed obligations on state officials with respect to a federal regulatory scheme.[9] Although the Court has not struck down a treaty or an executive agreement for impermissibly intruding upon state authority, it has in several instances construed such documents to avoid preemption of state law where the state law in question involved a traditional area of state competence and applied equally to citizens and non-citizens.[10]

One of those instances regards the Vienna Convention treaty itself; the Supreme Court has explicitly recognized that the treaty does not preempt state rules of procedural default.[11] To the extent that the President purports to trump such state rules by the memorandum, then, he does not act pursuant to the treaty's authorization. Nor does he act according to the Optional Protocol, which gave the Interna-

tional Court of Justice (ICJ) jurisdiction of disputes "arising out of the interpretation or application of the Convention" but did not purport to confer jurisdiction regarding the *remedy* to apply in the event the ICJ determined that a violation of the treaty had occurred.[12] Even if the ICJ had been authorized to craft a remedy, however, that authorization surely could not include deciding which level or organ of government would implement such a remedy; the latter would be an internal matter for the party-nation itself to determine.

Consequently, the President must depend solely upon his inherent foreign relations power to justify the action he has taken, and as a result, his action should be subject to greater scrutiny. It is true that the President's foreign relations power can accomplish the preemption of state law through, for example, executive agreement.[13] But the treaty process, with the

---

**8.** *Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (striking down law criminalizing possession of a firearm in a gun-free school zone); *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 146 L.Ed.2d 658 (2000)(invalidating statutorily-created civil cause of action for victims of gender-motivated violence).

**9.** *Printz v. United States,* 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997)(striking provision requiring state and local law enforcement officials to conduct background checks on prospective handgun purchasers).

**10.** *Todok v. Union State Bank,* 281 U.S. 449, 454–455, 50 S.Ct. 363, 74 L.Ed. 956 (1930)(treaty of amity and commerce did not preempt Nebraska homestead law); *Guaranty Trust Co. v. United States,* 304 U.S. 126, 142–143, 58 S.Ct. 785, 82 L.Ed. 1224 (1938)(executive agreement with the Soviet Government assigning economic claims did not preempt New York statute of limitations); *Sanchez–Llamas v. Oregon,* —— U.S. ——, ——–——, 126 S.Ct. 2669, 2682–2688, 165 L.Ed.2d 557 (2006)(Vienna Convention treaty does not preempt state rules of procedural default).

**11.** *Sanchez–Llamas, supra.*

**12.** Under the ICJ statute, four different topics can be made subject to the international court's compulsory jurisdiction:
 a. the interpretation of a treaty;
 b. any question of international law;
 c. the existence of any fact which, if established would constitute a breach of an international obligation,
 d. *the nature and extent of the reparation to be made for the breach of an international obligation.*
STATUTE OF THE COURT OF INTERNATIONAL JUSTICE, Art. 36, § 2 (emphasis added). The Optional Protocol subjects to the ICJ's compulsory jurisdiction only "[d]isputes arising out of the *interpretation or application* of the Convention." OPTIONAL PROTOCOL TO VIENNA CONVENTION ON CONSULAR RELATIONS CONCERNING THE COMPULSORY SETTLEMENT OF DISPUTES, Art. I (emphasis added).

**13.** *Garamendi,* 539 U.S. at 416, 123 S.Ct. 2374 ("Generally, then valid executive agreements are fit to preempt state law, just as treaties are," but see caveat referenced earlier in this opinion and cited in footnote 2).

requirement that a supermajority of the Senate concur, is in the United States Constitution for a reason;[14] Alexander Hamilton suggested in the Federalist Papers that the provision operates as an important check on the President's power.[15] I find it significant that this check is exercised by the Senate, the organ of the national government most closely aligned with the states.

The Supreme Court has suggested that the proper analysis for determining whether a president's exercise of his foreign relations power preempts state law is to determine first whether the state has acted within an area of "traditional state responsibility," and if it has, to assess the degree of conflict with federal policy and the strength of the state interest involved.[16] Unlike other federal preemption cases in which a state has prevailed, we address here an express, stark conflict between the President's assertion of power (at least under the Justice Department's interpretation) and the state law at issue. Nevertheless, given the principle that a weighty state interest lessens the likelihood of federal preemption, it follows that a president cannot use his foreign affairs authority to intrude into the state arena with impunity: at some point, the national interest is served in too attenuated a manner by the specific presidential action, and the state interest intruded upon is too fundamental, to permit a president's intervention.

Such a case is now before us. Criminal justice is an area primarily of state concern. The Supreme Court has repeatedly recognized that the "States possess primary authority for defining and enforcing the criminal law."[17] And states have, to say the least, an overwhelming interest in the procedures followed in their own courts. In *Younger*, the Supreme Court found that "a proper respect for state functions" counseled against injunctive interference by the federal courts with the progress of a state prosecution.[18] But the presidential memorandum attempts to do something just as intrusive: it attempts to *force* the states to conduct proceedings they would not otherwise conduct and to do so in a manner inconsistent with their own procedures. The Supreme Court has itself refrained from engaging in this kind of "lawmaking."[19] Moreover, the memorandum ignores "the importance of the procedural default rules in an adversary system."[20] These rules, which are neutral—applying to everyone, not just foreign nationals—"are designed to encourage parties to raise their claims promptly

---

**14.** *See* U.S. Const., Art. II, § 2 ("He shall have Power, by and with the Advice and Consent of the Senate, to make Treaties, provided that two thirds of the Senators present concur").

**15.** Alexander Hamilton, FEDERALIST PAPERS, No. 75.

**16.** *Garamendi*, 539 U.S. at 420, 420 n. 11, 123 S.Ct. 2374.

**17.** *Lopez*, 514 U.S. at 561 n. 3, 115 S.Ct. 1624 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 635, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)(quoting *Engle v. Isaac*, 456 U.S. 107, 128, 102 S.Ct. 1558, 71 L.Ed.2d 783 (1982))).

**18.** 401 U.S. at 44, 91 S.Ct. 746.

**19.** *Sanchez–Llamas*, 126 S.Ct. at 2680 ("where a treaty does not provide a particular remedy, either expressly or implicitly, it is not for the federal courts to impose one on the States through lawmaking of their own"), 2687 (The petitioner "asks us to require the *States* to hear Vienna Convention claims raised for the first time in *state* postconviction proceedings. Given that the convention itself imposes no such requirement, we do not perceive any grounds for us to revise state procedural rules in this fashion.")(emphasis in original).

**20.** *Id.* at 2685.

and to vindicate the law's important interest in finality of judgments."[21] When a habeas petitioner asked the United States Supreme Court in *Sanchez–Llamas* to exempt Vienna Convention claims from the rules of procedural default, the Court responded that the relief requested was "by any measure, extraordinary."[22] The Court observed that the exception to procedural default rules requested in that case (as in this one) "is accorded to almost no other right, including many of our most fundamental constitutional protections."[23] The President's action here is unprecedented.

And such extraordinary action is not necessary. The adversary system offers the foreign national the opportunity to raise a Vienna Convention claim before or during trial. If he does so, the trial court is in a position to afford an appropriate remedy—if a judicial remedy is appropriate at all.[24] If the foreign national is represented by counsel, and counsel fails to raise the Vienna Convention issue in a timely fashion, then a "safety valve" exists in the form of an ineffective assistance of counsel claim that can be raised on an initial application for writ of habeas corpus. If all other avenues in the state are exhausted, the foreign national can still apply to the Board of Pardons and Parole and the Governor for executive clemency. And the foreign national has the option to litigate a habeas petition in the federal system.

The President has made an admirable attempt to resolve a complicated issue involving the United States' international obligations. But this unprecedented, unnecessary, and intrusive exercise of power over the Texas court system cannot be supported by the foreign policy authority conferred on him by the United States Constitution. As a consequence, the presidential memorandum does not constitute a new legal or factual basis for relief under Art. 11.071, § 5, nor does it override § 5's requirements.

With these comments, I concur in the judgment with regard to the analysis of the president's memorandum and otherwise join the Court's opinion.

PRICE, J., concurring.

I agree with the majority's analysis and rationale, and, therefore, join the majority. Nevertheless, I write separately to advise law enforcement of this State to honor the provisions of Article 36 of the Vienna Convention and apprise foreign nationals of their rights under the treaty.

A key issue, however, is the question of whether Article 36 of the Vienna Convention even confers individual rights upon detained foreign nationals. I believe it does. Pertinent language of the treaty states "if [the detained foreign national] so requests, the competent authorities of the receiving State shall, without delay, inform the consular post ...."[1] Since a foreign national may request that the consular official be notified, it is quite logical to conclude that it is the foreign national's personal decision to make whether the consulate is or is not notified. This decision is not left to public or diplomatic officials; rather, the detainee is to decide.

21. *Id.*

22. *Id.* at 2687.

23. *Id.* at 2688.

24. *See Id.* at 2680 (expressing doubt about the appropriateness of a judicial remedy).

1. Vienna Convention on Consular Relations and Optional Protocol on Disputes ("Vienna Convention") art. 36(1)(b), *done* April 24, 1963, 21 U.S.T. 77, 596 U.N.T.S. 261.

Furthermore, the treaty explicitly directs a consular officer to desist in aiding a detained national if that is the national's desire.[2] This language provides additional support for the position that Article 36 creates individual rights for the signatory-nation's citizenry. It is apparent that the power of choice is left to the foreign national. Though the United States Supreme Court has not directly ruled on this issue, a strong voice on that Court favors the position that individual rights are conferred by the Vienna Convention.[3]

Article 36 of the Vienna Convention provides foreign nationals the option to invoke their right of access and communication with the consular officer.[4] Without being aware of this option, the vast majority of nationals arrested will almost certainly fail to invoke this right and succumb to our procedural default rules. Since I agree with the majority's application of procedural default to Article 36, I find it all the more imperative for a foreign national in the custody of law enforcement in this State to be informed of his treaty rights. Unless he is informed of what his rights are under the Vienna Convention, those rights will be of no use to him. One must be aware of these rights before one can properly exercise them. Not only is it imperative as a practical matter, Article 36 compels it.[5]

So long as the United States recognizes the Vienna Convention on Consular Relations, this State and all law enforcement that fall within its boundaries are required to faithfully comply with the Convention's agreed-upon provisions.[6] The fact that this State borders a foreign nation only amplifies the need for authorities to be well-versed in the language of Article 36. I believe this does not create an undue burden on law enforcement, but brings to light an obligation that must be fulfilled in the same manner we all hope is reciprocated by other nations whose detained nationals might be United States citizens. With these additional comments, I respectfully join the majority.

HERVEY, J., concurring.

This international *cause célèbre* centers around this applicant who makes no claim that he did not brutally rape and murder two teenage girls (ages 14 and 16) with fellow gang members over 13 years ago in the summer of 1993. The evidence from applicant's 1994 trial shows that he boasted about his active participation in these crimes. He bragged about how he sexually assaulted the two victims. He related that he put his foot on the throat of one of the girls because he was having difficulty strangling her with a shoelace and she would not die. The girls were unrecognizable when their bodies were found.

This case has dragged on for an amount of time equal to almost the entirety of the lives of these two girls. For many years, in both state and federal courts, applicant

2. *Id.* at art. 36(1)(c).

3. *See Sanchez–Llamas v. Oregon,* —— U.S. ——, ——, 126 S.Ct. 2669, 2688, 165 L.Ed.2d 557 (2006) (Ginsberg, J., concurring) (agreeing with the dissent of Justice Breyer, Justice Stevens and Justice Souter that the Vienna Convention "grants rights that may be invoked by an individual in a judicial proceeding"). Since the Court decided the case on procedural default grounds, the majority in *Sanchez–Llamas* assumed, without deciding, that the treaty grants individual rights. *Id.* at 2674.

4. Vienna Convention art. 36(1), *supra* fn. 1.

5. *See* Vienna Convention art. 36(1)(b), *supra* fn. 1 ("The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph[.]").

6. U.S. CONST. art. VI, cl. 2.

has received the almost unparalleled due process protections afforded by our country's laws. Now, from half-way around the world, the International Court of Justice in its *Avena* decision has ordered our state courts to review applicant's Article 36 Vienna Convention claim which applicant did not even raise until his first state habeas application. The President of the United States has made a similar request.

But, all of this is really much ado about nothing because applicant received essentially the review mandated by the *Avena* decision during his initial state habeas corpus proceeding.[1] The Court's 60 plus page opinion disposing of applicant's current successive habeas corpus application provides applicant with much more than he deserves and is also consistent with the President's unprecedented memorandum expressing the United States' intent to discharge its international obligations under *Avena* "by having State courts give effect to the [*Avena*] decision in accordance with general principles of comity." The Court's opinion in this proceeding affords the *Avena* decision all the "respectful consideration" that it deserves "in accordance with general principles of comity."

Finally, applicant is by no means a stranger in a strange land. He has lived in this country and enjoyed its benefits since he was three-years old. From the record, it appears that he is fluent in English. Other than his surname, there is nothing to suggest that he is anything other than native-born. Indeed, he did not bother telling the police of his non-citizenship. And the constitutional rights available to all accused persons in American courts are his, as well. According to the record, they were scrupulously protected.

Nevertheless, applicant maintains that the lack of intentional, reckless, or negligent wrongdoing by the State (other than, perhaps, the lack of clairvoyance), and despite his non-assertion of any privilege or immunity, he is entitled to an immunity heretofore not afforded to any citizen or nonresident under Texas or Federal law— immunity from procedural default. He argues that he has this immunity simply because he happened to be born on foreign soil approximately 28 years ago and, for whatever reason, has elected not to apply for United States citizenship.

With these comments, I join the Court's opinion.

COCHRAN, J.,concurring, in which JOHNSON, and HOLCOMB, JJ., joined.

I join all of the Court's opinion except for Section IIIB dealing with the Presidential Memorandum. I am unable to conclude that a memorandum from the President to his Attorney General constitutes the enactment of federal law that is binding on all state courts. This memorandum, discussing compliance with the decision of the International Court of Justice in *Avena,* looks much more like a memo than a law. The Solicitor General, in his amicus brief, has attached a copy of the President's memo, entitled "Memorandum for the Attorney General[,]" as well as a copy of a letter written by Attorney General Alberto R. Gonzales to The Honorable Greg Abbott, the Attorney General of the State of Texas, discussing that memo. We normally do not consider documents that are attached to briefs for the truth of the matters contained within them.[1] But of course this Court may always take judicial

---

1. *See, e.g.,* Amicus Brief of the Criminal Justice Legal Foundation at 5 (question of whether the Texas courts are required to comply with *Avena* decision is moot because appli-

cant has already received the adjudication to which *Avena* says he is entitled).

1. *See Ex parte Simpson,* 136 S.W.3d 660, 668 (Tex.Crim.App.2004) ("There is no provision

notice of laws because laws are printed and promulgated in official government volumes and are readily available to any interested member of the public.[2]

Presidential proclamations and Executive orders, except those which do not have general applicability and legal effect or are effective only against federal agencies, are drafted, reviewed, and promulgated in a specific manner and then published in the Federal Register.[3] This memo is not written in the manner prescribed for Presiden-

in article 11.071 that permits either the State or the habeas applicant to submit original evidence directly to this Court. Evidentiary affidavits, letters, transcripts, or other documents relating to a habeas claim should not be attached to motions or briefs, and they shall not, and will not, be considered by this Court.") *Surety Ins. Co. of Cal. v. State*, 556 S.W.2d 329, 331 (Tex.Crim.App.1977) (exhibits attached to a brief cannot be considered "as these papers are not part of the official record"); *Ex parte Schoen*, 460 S.W.2d 923, 925 (Tex.Crim.App.1970) (supporting papers pertaining to an extradition cause, attached to a document in the appellate record, are not properly before the court because they were not introduced during the habeas proceeding).

2. *See Plaster v. State*, 567 S.W.2d 500, 502 (Tex.Crim.App.1978); *Mosqueda v. Albright Transfer & Storage Co.*, 320 S.W.2d 867, 876 (Tex.Civ.App.-Fort Worth 1959, writ ref'd n.r.e.) (op. on reh'g). In *Mosqueda,* the court of civil appeals suggested that Texas courts

must take judicial notice of the laws of the United States, including all the public acts and resolutions of Congress and proclamations of the president thereunder. Administrative rules adopted by boards, departments, and commissions pursuant to federal statutes are also matters of judicial knowledge. When such regulations are published in the Federal Register a federal statute provides that their contents shall be judicially noticed.

*Id.* (quoting ROY R. RAY & WILLIAM F. YOUNG, JR., TEXAS LAW OF EVIDENCE CIVIL AND CRIMINAL § 172 (2d ed.1956)).

3. *See generally* 44 U.S.C. § 1505(a)(1) ("Documents having general applicability and legal effect means any document issued under proper authority prescribing a penalty or course of conduct, conferring a right, privilege, authority, or immunity, or imposing an obligation, and relevant or applicable to the general public, members of a class, or persons in a locality, as distinguished from named individuals or organizations ..."). The Presidential Executive Order of September 9, 1987, stipulates the manner in which proposed Executive orders and proclamations are to be prepared, printed, and published: these requirements include:

(g) Proclamations issued by the President shall conclude with the following described recitation—
"IN WITNESS WHEREOF, I have hereunto set my hand this _____ day of _____, in the year of our lord, and of the Independence of the United States of America, the _____.
. . .
Sec. 2. Routing and approval of drafts.
(a) A proposed Executive order or proclamation shall first be submitted, with seven copies thereof, to the Director of the Office of Management and Budget, together with a letter, signed by the head or other properly authorized officer of the originating Federal agency, explaining the nature, purpose, background, and effect of the proposed Executive order or proclamation and its relationship, if any, to pertinent laws and other Executive orders or proclamations.
(b) If the Director of the Office of Management and Budget approves the proposed Executive order or proclamation, he shall transmit it to the Attorney General for his consideration as to both form and legality.
. . . .
Sec. 3. Routing and certification of originals and copies. (a) If the order or proclamation is signed by the President, the original and two copies thereof shall be forwarded to the Director of the Office of the Federal Register for publication in the Federal Register.
(b) The Office of the Federal Register shall cause to be placed upon the copies of all Executive orders and proclamations forwarded as provided in subsection (a) of this section the following notation, to be signed by the Director or by some person authorized by him to sign such notation: "Certified to be a true copy of the original."

tial Proclamations or Executive Orders. It is written in a private memo style. I am unable to find a copy of this memo published in the Federal Register. In fact, the only public publication of this memo that I can find is on the White House Press Release Internet website.[4] I cannot accept the proposition that binding federal law, either through Congressional enactment or Executive Order, can be accomplished through a Presidential press release of a private memorandum directed to the Attorney General. Thus, I cannot accept the premise that the President's memo to his Attorney General is federal law that could supercede and obviate a clear and explicit Texas statute.[5] Thus, I find it unnecessary to undertake a separation of powers analysis as does the majority.

**4.** http://www.whitehouse.g ov/news/releases/2005/02/20050228– 18.html.

**5.** Ironically, the very law that the President's memo would supercede, article 11.071 of the Texas Code of Criminal Procedure, is a legislative enactment that the President, while Governor of the State of Texas, signed into law on June 7, 1995. *See* "The Habeas Corpus Reform Act," 74th Leg., R.S., ch.319, § 1, 1995 Tex. Gen. Laws 2764.